**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Daniel Raymond ALDERDYCE,
Defendant-Appellant.**

No. 85–3042.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 7, 1986.

Decided April 23, 1986.

William Youngman, Asst. U.S. Atty., Portland, Or., for plaintiff-appellee.

Hollis McMilan, Asst. Federal Public Defender, Portland, Or., for defendant-appellant.

Before SKOPIL, NELSON, and BOOCHEVER, Circuit Judges.

SKOPIL, Circuit Judge:

This is an appeal from judgments of conviction on one count of assault with intent to commit rape in violation of 18 U.S.C. § 113(a), one count of rape in violation of 18 U.S.C. § 2031, and one count of sodomy in violation of 18 U.S.C. § 13 and O.R.S. § 163.405. We affirm.

## FACTS AND PROCEEDINGS BELOW

On December 7, 1984 appellant Alderdyce was visiting a friend, JK, in Salem. JK asked Alderdyce to give his friends, PC, BS, and MG, a ride to a local park where they were to meet some girls. The girls, JO, the complaining witness, DC, DA, and CTB, were from the Chemawa Indian School. Alderdyce drove PC and his friends to the park.

While at the park PC, BS, and MG invited the girls back to JK's house. MC and JK arrived a short time later. The group listened to music and continued drinking. Alderdyce and JK left. Alderdyce returned approximately an hour later.

At some point, three of the girls left the party and went back to the school. JO, the complaining witness, who remained at JK's house, was intoxicated. She eventually became sick and passed out in a bedroom. There is conflicting testimony as to what occurred at that point.

MG testified that he alone entered the bedroom to try to rouse JO. MC claimed that Alderdyce went into the bedroom and that PC and MG found him "making a pass" at JO. MC claimed he also tried to rouse JO. PC, MC, and MG all testified that they did not have intercourse with JO and knew of no one who did.

Alderdyce testified that when he arrived back at the house none of the girls were in view. At that point he asked MC what was going on. MC allegedly replied that they were "pulling a train," i.e., having sexual intercourse, on the girl in the bedroom. Alderdyce said he was disgusted by this and pulled back a blanket covering the bedroom door. He claimed it was too dark to see, but that someone told him to get out. Alderdyce left and sat in the living room. One of the men then emerged from the bedroom with JO. Thereafter, PC, MG, BS, and MC dropped JO off at the Navajo Trail, which leads to the school dormatories. Alderdyce followed the group to the trail. It is unclear whether the men noticed Alderdyce at that time. In any event,

PC left JO at the trail and drove BS home. What occurred next is disputed.

JO testified that Alderdyce came up behind her and pushed her to the ground. He then pinned her and threatened to kill her if she did not keep quiet. She claims Alderdyce raped and sodomized her. The temperature was about thirty-three degrees that evening. Alderdyce claims he offered to help JO down the trail because she appeared unsteady. Alderdyce, a former member of Alcoholics Anonymous, claimed he chastised her for drinking. Alderdyce admitted to having five or six drinks that night. Alderdyce also claims he asked JO why she let the others have intercourse with her. She allegedly responded by asking him if he wanted to "get laid." He said no. When she began fondling him, however, Alderdyce claims he submitted against his better judgment. He denies having intercourse or oral sex with JO.

After PC, MG, and MC drove BS home, they noticed Alderdyce's car parked at the head of the trail. A resident living near the trail also noticed Alderdyce's car, although he heard no commotion. The men eventually walked down the trail. Off the side of the trail they found Alderdyce lying on top of JO with his midsection over her face and his head between her legs. They continued down the trial to discuss what to do. They decided to go back and apprehend Alderdyce.

MC kicked Alderdyce off JO. JO then pulled up her pants, claimed she had been raped, and ran down the trail. MC testified that at that point Alderdyce said, "Don't listen to her, all women say that." Alderdyce then ran up the hill and drove away, hitting a parked car in the process. Two residents in the area observed the defendant driving away and hitting the parked car. Alderdyce claims he ran away because he was afraid of being beaten up.

PC took JO to her dormitory and reported the rape. She was then taken to a hospital and examined. PC, MC, and MG then met a school security officer at the trail and identified the spot where they found Alderdyce and JO. Alderdyce's identification was located on the trail.

The police found Alderdyce hiding in the bathroom at his brother's apartment in Salem. He had no identification and claimed to have lost it in Eugene. Alderdyce was arrested, read his rights, and taken to the Marion County Jail. A few hours later, Bureau of Indian Affairs Agent Hamby arrived to question Alderdyce. The Chemewa School security guard was also present. Alderdyce was advised orally and in writing of his *Miranda* rights. He indicated he understood his rights, but declined to sign the waiver form. Hamby then asked Alderdyce what he had done the previous evening. Alderdyce claimed he had been at a party and had loaned a friend his car. He did not remember the name of his friend or what he looked like, nor had he heard from his friend since. Alderdyce's motion *in limine* to exclude statements made following his refusal to execute the waiver was denied.

On December 10, 1984 Alderdyce was taken before a magistrate for a first appearance. Following a hearing, the magistrate found probable cause to believe Alderdyce had committed the offense of rape and ordered the case continued for arraignment. On December 18, 1984 an indictment was returned charging Alderdyce with rape and assault with intent to commit rape. He was arraigned on that indictment. A superseding indictment was filed on January 23, 1985. Alderdyce was arraigned on this indictment at a pretrial conference on February 4, 1985.

On December 13, 1984 the defendant subpoenaed hospital records of the examination of JO from the Salem Memorial Hospital. The hospital records were apparently incomplete and indicated that no sperm had been found during the examination of JO. About a week prior to trial, the Assistant United States Attorney informed defense counsel that a pap smear had been performed, the results of which were not available until sometime after the defendant had subpoenaed the hospital records. That test indicated the presence of motile

sperm. The government claims defense counsel was informed of this fact as soon as it was learned. Defense counsel then made arrangements to have Alderdyce's clothing examined for the presence of sperm. The United States Attorney also requested that JO's underpants, which had been held as evidence, be examined for the presence of sperm. Seminal fluid was found on JO's underpants. No sperm was found on Alderdyce's clothing.

Defense counsel filed a motion to dismiss based on alleged *Brady* violations by the government. The court denied the motion, but granted a continuance to allow scientific testing to be performed on the underpants. Blood tests indicated that JO and Alderdyce were Type A and the seminal fluid was Type A. Enzyme tests, however, were inconclusive.

Defense counsel also reviewed the "rape kit" prepared during the examination of JO. The kit contained a checklist of procedures to be performed. One of those procedures was a swabbing of the vaginal tract. The swabs were not part of the kit in this case. The box indicating that the procedure had been done was not checked off. It is unclear whether the swabbing was not done, or whether the swabs taken from the vaginal area were lost or discarded. Defendant renewed his motion to dismiss, or alternatively for a mistrial, at various points throughout the proceedings. These motions were denied without any factual findings.

On February 27, 1985 the jury returned verdicts of guilty on all counts. Alderdyce was sentenced to serve a period of eight years in the custody of the Attorney General on each count, the sentences to run concurrently. Alderdyce timely appealed the judgments of conviction.

## DISCUSSION

A. *Miranda* Issue.

 A finding that a defendant knowingly and voluntarily waived his *Miranda* rights will be reversed only if it is clearly erroneous. *United States v. Doe*, 764 F.2d 695, 697 (9th Cir.1985). Whether a waiver of rights is voluntary, knowing, and intelligent depends on the totality of circumstances, including the background, experience, and conduct of the defendant. *North Carolina v. Butler*, 441 U.S. 369, 374–75, 99 S.Ct. 1755, 1757–58, 60 L.Ed.2d 286 (1979) (citing *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)). A signed waiver form is one factor to be considered. *United States v. Binder*, 769 F.2d 595, 599 (9th Cir.1985); see also *United States v. Nick*, 604 F.2d 1199, 1201 (9th Cir.1979). The prosecution has the burden of showing a valid waiver. There is a presumption against a waiver. *Butler*, 441 U.S. at 373, 99 S.Ct. at 1757.

 Relying on *United States v. Heldt*, 745 F.2d 1275 (9th Cir.1984), defendant contends that his refusal to execute a waiver of rights form was an assertion of his right to remain silent which was not honored when the agent questioned him about his whereabouts the previous evening. In *Heldt*, this court held that a refusal to sign a waiver form "casts initial doubt on any claim that [defendant] waived his *Miranda* right." *Id.* at 1277. This court further recognized that "[u]nder some circumstances, declining to sign a *Miranda* waiver form will be an assertion of the right to silence...." *Id.* at 1278 (quoting *United States v. Boyce*, 594 F.2d 1246, 1250 (9th Cir.), *cert. denied*, 444 U.S. 855, 100 S.Ct. 112, 62 L.Ed.2d 73 (1979)).

We need not decide whether the defendant's *Miranda* rights were violated in this case. Assuming the district court erred in admitting the defendant's statements following his refusal to sign a waiver, the error was harmless. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). The only statements the defendant made following his refusal to sign the waiver form were statements concerning his whereabouts at the time of the rape. Those statements were potentially exculpatory. At trial, the defendant conceded and the other evidence overwhelmingly indicated, however, that the defendant was in fact with JO on the evening in question. Defendant's statements as to his whereabouts were thereby admitted only to impeach his credibility. While credibility

determinations may be significant, in light of the substantial independent evidence connecting the defendant to this crime, this single piece of impeaching evidence was harmless beyond a reasonable doubt. *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828.

**B. *Brady* Violations.**

■ The due process clause of the Constitution prohibits the prosecution from suppressing "evidence favorable to an accused ... where the evidence is material either to guilt or to punishment...." *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963). The duty to disclose exculpatory evidence prior to or at trial exists even in the absence of a specific request for the evidence by defense counsel. *United States v. Agurs,* 427 U.S. 97, 110, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976); *United States v. Hibler,* 463 F.2d 455, 459 (9th Cir.1972). The test for reversal in such situations is whether "the government failed to disclose evidence which, in the context of [the] particular case, might have led the jury to entertain a reasonable doubt about [the defendant's] guilt." *Hilliard v. Spalding,* 719 F.2d 1443, 1445 (9th Cir.1983) (quoting *United States v. Hibler,* 463 F.2d at 460).

Appellant contends the government violated its duty under *Brady* when it (1) failed to promptly disclose the presence of motile sperm following a pap smear; (2) failed to preserve JO's underpants in a manner which would allow for subsequent scientific tests; and (3) failed to preserve vaginal swabs from the rape kit. The gist of appellant's arguments concerning alleged *Brady* violations is that based on hospital records, he was misled to believe that no sperm had been discovered, and therefore did not request that the victim's clothes be tested. Relying on *Hilliard,* appellant argues that eventual tests of the victim's clothes were inconclusive because of the delay in learning of the presence of sperm and the government's alleged failure to properly preserve the victim's clothing.

In *Hilliard,* this court held that

if a sperm sample is taken from the victim and the prosecution is in possession of or has control over the sample

and is aware of its exculpatory nature, the prosecution is constitutionally required to disclose the existence of the sample and to make it available to the defense, even if defense counsel does not specifically request that the prosecution do so. This holding does not require the government to take a sample, or to independently test it.

*Id.* at 1447. In *Hilliard,* a sperm sample taken from the victim was not made available to the defendant either because it was lost or had been destroyed. Relying on the fact that the testing of such a sample will often prove a defendant innocent of the crime, the court concluded that when a sample in the government's possession is subsequently not available for testing by the defendant, prejudice to the defendant should be presumed. *Id.* at 1446–47. It was unclear in *Hilliard* whether the government was in possession or aware of the potentially exculpatory nature of the sperm sample. The court therefore remanded the case for a determination of these factual matters. *Id.* at 1447.

This case is distinguishable from *Hilliard.* This is not a case in which the only sperm sample taken was not disclosed to the defendant. The results of the pap smear were indeed disclosed to the defendant prior to trial as soon as the government learned of those results. *See Agurs,* 427 U.S. at 103, 96 S.Ct. at 2397 (the rule of *Brady v. Maryland* does not apply when information is furnished at or before trial). *Accord United States v. Multi-Management, Inc.,* 743 F.2d 1359, 1363 (9th Cir. 1984) (tardy disclosure of exculpatory material did not warrant reversal where the defendant was made aware of evidence prior to the trial and there was no suggestion that the government was aware of the evidence prior to its disclosure); *United States v. Medina-Gasca,* 739 F.2d 1451, 1454 (9th Cir.1984) (same). In this case both the government and the defendant were functioning under the same misconception, based upon their examination of the hospital records, that no sperm had been found during the examination of JO. The delay in disclosing that sperm had in fact been found during the examination

was due to the hospital's delay in informing counsel for both the government and the defendant that a pap smear had been performed which did in fact indicate the presence of sperm.

Nothing we say here should be construed to condone unnecessary delays by the government in revealing potentially exculpatory evidence. However, in this case, the delay in disclosure, approximately five weeks from the date of the original indictment and two weeks from the date of the superseding indictment, was not excessive and the defendant was granted a continuance of the trial date to allow examination and testing of the potentially exculpatory evidence. Moreover, there was no indication in the record that what occurred here was due to either intentional misconduct or negligence on the part of any government official. See *California v. Trombetta*, 467 U.S. 479, 485–89, 104 S.Ct. 2528, 2532–34, 81 L.Ed.2d 413 (1984) (discussing the nature of the government's obligation to provide a defendant access to evidence). In fact, when the sperm samples were uncovered and blood type tests were performed on those samples, the results proved to be inculpatory rather than exculpatory. There is no reason to believe, therefore, that the government had any incentive in delaying disclosure of this information.

■ Appellant further contends, however, that because he was misled to believe that no sperm had been discovered, he did not test the victim's clothing and eventual tests of the victims clothing were inconclusive either because of this delay and/or because of the failure to preserve the clothing in a manner that would allow for testing. There are a number of reasons why we are unpersuaded by appellant's arguments in this regard. First, the victim's clothing was available for testing at any time prior to trial. The defendant's tactical decision not to test the victim's clothing prior to the disclosure of the results of the pap smear test cannot be attributed, as we have already noted, to any affirmative misconduct on the part of the government. If the prosecutor delays disclosing information to which he or she has access, or if the prosecutor is aware of the existence of potentially exculpatory evidence, but fails to take the most rudimentary steps to obtain access to, to preserve, or to promptly disclose such evidence, then he or she may be in violation of the duty established under *Brady v. Maryland.* See *Trombetta*, 467 U.S. at 487–88, 104 S.Ct. at 2532–33 (discussing the government's obligation to preserve and provide access to exculpatory evidence). But cf. *United States v. Kennedy*, 714 F.2d 968, 976 (9th Cir.1983) (the government's destruction of semen stains on the victim's panty and slip did not warrant reversal), *cert. denied*, 465 U.S. 1034, 104 S.Ct. 1305, 79 L.Ed.2d 704 (1984). Here, however, as we previously noted, the evidence is simply insufficient to establish the kind of misconduct on the part of the prosecutor which gives rise to a *Brady-Agurs* violation. Moreover, the testimony in this case simply failed to establish that the delay in testing the clothing, rather than the condition of the clothing when it was received by the government, was responsible for the inconclusive test results. In fact, expert testimony indicated that successful enzyme testing is unusual and in this case was particularly unlikely given the soiled condition of the underpants.

■ Finally, appellant contends that the government violated its duty under *Brady v. Maryland* when it failed to preserve the vaginal swabs from the hospital rape kit. Initially there is conflicting testimony about whether swabbing was done or whether swabs were simply lost or discarded. We cannot conclude that the district court erred in denying the motion for a mistrial based on the government's alleged failure to preserve vaginal swabs. There was sufficient evidence to indicate either that vaginal swabs were not part of the hospital rape kit in this case or that no swabs were in fact taken. Moreover, even if such swabs were taken, the failure to disclose or preserve those swabs was not necessarily a violation of *Brady.* See *Trombetta*, 467 U.S. at 491, 104 S.Ct. at 2535 (due process does not require the state to preserve breath samples of suspected drunk drivers). Finally, in this case, unlike *Hilliard*, the vaginal swabs were not the only sperm samples taken. Here,

both the results of the pap smear, the sperm samples found on the victim's clothing, and the results of tests done on the sperm samples in the government's possession were made available to the defendant. Therefore, even assuming swabs were taken in this case, but were subsequently misplaced while in the hands of the government, unlike *Hilliard,* this is not a case in which the appellant was completely deprived of potentially exculpatory evidence. See *Trombetta,* 467 U.S. at ——, 104 S.Ct. at 2534 (to meet the constitutional standard of materiality, evidence must possess an exculpatory value that was apparent before the evidence was destroyed and also be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonable means). For all of the reasons stated, we hold that the government did not violate its duty under *Brady v. Maryland* to inform the defendant of potentially exculpatory evidence.

AFFIRMED.