**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Arnold SHERLOCK and Ronald**
**Charley, Defendants–**
**Appellants.**

**Nos. 87–1299, 87–1300.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 9, 1988.

Decided Jan. 11, 1989.

As Amended April 27, 1992.

Thomas M. Hoidal, Asst. Federal Public Defender, Phoenix, Ariz. and John Trebon, Flagstaff, Ariz., for defendants-appellants.

Thomas M. Connelly, Asst. U.S. Atty., Phoenix, Ariz., for plaintiff-appellee.

Before: WRIGHT and POOLE, Circuit Judges, and WILLIAMS,* District Judge.

EUGENE A. WRIGHT, Circuit Judge:

After a troublesome joint trial, a jury convicted Arnold Sherlock and Ronald Charley of assault with intent to commit rape on an Indian Reservation. This week-long trial involved the contradictory testimony of witnesses, the temporary exclusion of family members from the court-room, prosecutorial misconduct, and several motions for severance and mistrial.

Sherlock and Charley raise many errors. They contend that excessive preindictment delay denied them due process; the court failed to afford them a public trial; its failure to sever the trials, as well as prosecutorial misconduct, denied them a fair trial; and it erred in admitting hearsay testimony and in rejecting suggested jury instructions.

We reverse Sherlock's conviction and remand for a new trial. The court committed reversible error in denying his motions for mistrial and severance primarily based on the prosecutor's misuse of Charley's extrajudicial statement implicating Sherlock. Although the joint trial may have prejudiced Charley, we conclude that it did not deny him a fair trial. We affirm his conviction.

### GENERAL FACTS

The alleged rapes of Marie Rose Bennally and Thomascita Billie occurred several miles from their school on a Navajo Indian Reservation in Arizona. On March 9, 1984 the girls accompanied four Navajo Indians, including Sherlock and Charley, in a truck off the school grounds. They stopped near a windmill in the countryside where two other Indian males joined them. All drank beer except M. Sherlock, who left before the alleged crimes. At trial both girls testified that the boys forced them to drink beer. Other witnesses contradicted that testimony.

Later, the group drove further from the school and stopped in an open area. Billie testified that while in the truck with Sherlock, he locked the doors and raped her. Bennally testified that she had left the truck to go to the bathroom when Charley tripped her and forced her to have sexual intercourse.

After the alleged rapes, both girls walked to the nearby Clitso residence. Robert Clitso gave them a ride back to the

* Honorable David W. Williams, Senior United States District Judge, Central District of California, sitting by designation.

dorm, where they arrived after curfew. Later that night, both girls were interviewed by Navajo investigators and examined by a physician. At trial, many questions arose as to statements made to the Clitsos, persons at the dorm, and investigators.

## PROCEDURAL BACKGROUND

The original indictment charged Sherlock, Charley, M. Sherlock, and E. White, Jr. in five counts with rape and related sexual offenses.[1] Because of the common counts, crimes and evidence, the government intended to try all four defendants together. Before trial, however, the government dropped all charges against M. Sherlock and the several assault charges. On the first day of trial it dismissed with prejudice the charges against White. The final indictment consisted of only three counts. It charged Sherlock with rape of Thomascita Billie and charged Charley with rape of Marie Rose Bennally and carnal knowledge of her.[2]

Sherlock and Charley moved to dismiss based on excessive preindictment delay and loss of physical evidence obtained from the alleged victims. Sherlock also moved to sever the trials on grounds that the likely admission of a statement by Charley implicating him would violate his Fifth and Sixth Amendment rights. The court denied those motions, which were renewed at trial.

The week-long trial involved inconsistent testimony from the alleged victims and other witnesses. During Bennally's testimony, the judge temporarily excluded defendants' families after he determined that closure was necessary to protect her from disruptive spectators. Neither defendant testified and only Charley put on additional witnesses in his defense. Each based his defense on the government's failure to prove guilt.

A jury convicted both defendants of assault with intent to commit rape on an Indian Reservation. 18 U.S.C. §§ 113(a), 1153. The court imposed a sentence of three years on Sherlock and five years on Charley. Both moved for a new trial, which the court denied.

Because defendants' arguments must be considered in the context of their unusual trial, we provide more detailed facts as required by our analysis of several issues.

## ANALYSIS

**I. Fifth Amendment Due Process Claims**

Sherlock and Charley urge that preindictment delay denied them due process. They also contend that the government's failure to preserve the rape kit, allegedly exculpatory evidence, deprived them of due process. We disagree.

### A. Preindictment Delay

The alleged offenses occurred on March 9, 1984, thirty-six months before the government filed the indictments in February 1987. The statute of limitation would have expired March 9, 1989. Defendants moved to dismiss the indictments due to the delay.

 The Fifth Amendment guarantees that defendants will not be denied due process as a result of excessive preindictment delay. We scrutinize a violation of this guarantee under a two-pronged test. First, Sherlock and Charley must prove they suffered actual, non-speculative prejudice from the delay. *United States v. Lovasco*, 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977); *United States v. Moran*, 759 F.2d 777, 782 (9th Cir.1985), *cert. denied*, 474 U.S. 1102, 106 S.Ct. 885, 88 L.Ed.2d 920 (1986). Second, they must show that the delay, when balanced against the prosecution's reasons for it, offends those "fundamental conceptions of justice

---

1. The charges included rape; aiding and abetting rape; assault with intent to rape, aiding and abetting the same; and carnal knowledge; and aiding and abetting the same. M. Sherlock and White were charged with aiding and abetting the commission of every crime.

2. From the first day their trial involved separate defendants charged with separate crimes against separate victims. Joint trial was predicated on the physical and temporal proximity of the alleged crimes, and reliance on the same third-party witnesses in the two actions.

which lie at the base of our civil and political institutions." *See Lovasco*, 431 U.S. at 790, 97 S.Ct. at 2049 (quoting *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 341, 79 L.Ed. 791 (1935)); *Moran*, 759 F.2d at 781–82.

We review for abuse of discretion the court's denial of the motions to dismiss. *United States v. Wallace*, 848 F.2d 1464, 1470 (9th Cir.1988); *United States v. Rogers*, 722 F.2d 557, 561 (9th Cir.1983), *cert. denied*, 469 U.S. 835, 105 S.Ct. 129, 83 L.Ed.2d 70 (1984).

### 1. *Actual Prejudice*

"The defendant has a heavy burden to prove that a preindictment delay caused actual prejudice: the proof must be definite and not speculative, and the defendant must demonstrate how the loss of a witness and/or evidence is prejudicial to his case." *Moran*, 759 F.2d at 782 (citations omitted). Our cases reflect this heavy burden, as we frequently find actual prejudice lacking. *See, e.g., Wallace*, 848 F.2d at 1470; *United States v. Valentine*, 783 F.2d 1413, 1416–17 (9th Cir.1986). Here, we find the showing of prejudice to be slim.

First, the defendants assert that the alleged victims testified repeatedly that they could not remember certain events that occurred. Although the record is replete with examples of the girls' memory lapses when asked questions relating to the consumption of alcohol and other misconduct, we must question whether such lost testimony would qualify as prejudice necessary to establish a due process violation.

This court has "emphasized that protection from lost testimony generally falls solely within the ambit of the statute of limitations." *Moran*, 759 F.2d at 782; *United States v. Pallan*, 571 F.2d 497, 501 (9th Cir.), *cert. denied*, 436 U.S. 911, 98 S.Ct. 2249, 56 L.Ed.2d 411 (1978). Here, the record does not indicate how Billie and Bennally would have testified had their memories not dimmed. It does not show that the loss of their memories had meaningfully impaired defendants' abilities to defend themselves.

Second, they allege that loss of the rape kit prejudiced them because it would have established absence of dirt, grass or foreign substances in the victims' genital areas, absence of acid phosphotase on skin and clothing, and absence of stained or torn clothing. They note further that at trial Dr. Gloyd, who examined the girls, could testify only from her contemporaneous notes, and that because she preserved all physical evidence in the kit, she had no need to describe it separately in her notes.

The government responds that the jury convicted Sherlock and Charley of the lesser offense of assault with intent to commit rape. We agree that the rape kit would not likely have been exculpatory as to that crime. The record reveals that some exculpatory evidence from the kit, absence of semen in either girl, was preserved and argued at trial. Further, the unavailability of the rape kit did not necessarily result from the preindictment delay. *See United States v. Mills*, 641 F.2d 785, 789 (9th Cir.) (finding that even if the government had indicted defendants one month after the crime, the physical evidence could have been unavailable), *cert. denied*, 454 U.S. 902, 102 S.Ct. 409, 70 L.Ed.2d 221 (1981). Defendants could not establish that the government even had possession of the kit.

Finally, Charley alleges that the delay prevented him from serving his sentence concurrently with an earlier rape sentence, which would have reduced his total period of confinement. That argument is too speculative to establish actual prejudice. *See Valentine*, 783 F.2d at 1417. He offers no more than bare allegations that the delay deprived him of concurrent sentencing.

### 2. *Reasons for the Delay*

Before we may find a due process violation, Sherlock and Charley must show that the delay was caused by the government's culpability. *United States v. Loud Hawk*, 816 F.2d 1323, 1325 (9th Cir.1987); *Moran*, 759 F.2d at 783. The record does not show that the government's delay was undertaken solely "to gain tactical advantage over the accused." *Lovasco*, 431 U.S.

at 795, 97 S.Ct. at 2051 (quoting *United States v. Marion,* 404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971)).

In *Lovasco,* the Supreme Court held that the government's prosecution of a defendant after investigative delay did not violate due process even if his "defense might have been somewhat prejudiced by the lapse of time." 431 U.S. at 796, 97 S.Ct. at 2052. A prosecutor may have wide latitude to decide when to seek an indictment, especially when a case involves more than one person. *See id.* at 792–95, 97 S.Ct. at 2050–51.

Here, the prosecution explained adequately at pre-trial the reasons for its delay: the government's attempts to interview witnesses and law enforcement officers, the transfer of agents working on the case, and other investigative needs. The ongoing investigation was a legitimate reason for the delay. *United States v. Tornabene,* 687 F.2d 312, 317 (9th Cir.1982).

*B. Failure to Preserve Evidence*

Sherlock and Charley further allege that the government's failure to preserve the rape kit violated their right to a fair trial under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and subsequent cases.

In *Brady,* the Supreme Court held that a defendant has a constitutional privilege to obtain from the prosecution evidence material to his guilt or relevant to the punishment to be imposed. 373 U.S. at 87, 83 S.Ct. at 1196. "To meet this constitutional standard of materiality, evidence must possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta,* 467 U.S. 479, 489, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413 (1984) (citing *United States v. Agurs,* 427 U.S. 97, 109–10, 96 S.Ct. 2392, 2400–01, 49 L.Ed.2d 342 (1976)). A *Brady* violation may arise if the prosecutor fails "to take the most rudimentary steps to

obtain access to, to preserve, or to promptly disclose [exculpatory] evidence." *United States v. Alderdyce,* 787 F.2d 1365, 1370 (9th Cir.1986); *see Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988) (holding that the government's failure to preserve potentially useful evidence not a denial of due process unless defendant can show bad faith on the part of the government); *Trombetta,* 467 U.S. at 487–89, 104 S.Ct. at 2533–34 (discussing the government's duty to preserve exculpatory evidence).

This record does not establish the kind of misconduct that gives rise to a constitutional violation. There is no indication that the loss of the rape kit was due to the bad faith of any government agency. *See Youngblood,* 109 S.Ct. at 337. The court noted that neither the government nor its agents had possession or control of the kit or its test results. The testimony of Dr. Gloyd and Anselm Tom, Bureau of Indian Affairs investigator, revealed that they were unsure of what happened to the rape kit and did not know if any law enforcement agency ever had it.

Even assuming that the government had lost the kit, defendants were not deprived completely of potentially exculpatory evidence. *See Trombetta,* 467 U.S. at 490, 104 S.Ct. at 2534 (finding that defendants had alternative ways of demonstrating their innocence); *Alderdyce,* 787 F.2d at 1370–71 (finding no *Brady* violation when defendant was not deprived completely of exculpatory evidence). *But see Hilliard v. Spalding,* 719 F.2d 1443, 1446–47 (9th Cir.1983) (holding that court presumes prejudice when sperm sample, which was in the government's possession, is not available to defendant). Dr. Gloyd testified that she took fluid samples from the vaginal cavity of the alleged victims and found the results to be negative. Both defendants argued that Dr. Gloyd's testimony and the absence of any sperm was exculpatory. We hold that the court properly ruled that the government did not violate its duty under *Brady.*[3]

---

**3.** The court also did not err in refusing defen- dants' requested instruction on lost or destroyed

## II. Exclusion of Family Members

Sherlock and Charley argue that exclusion of their families during Bennally's testimony deprived them of their Sixth Amendment right to a public trial. We find no constitutional violation.

### A. The Public Trial Guarantee

██ The Sixth Amendment guarantees that a defendant shall enjoy "the right to a speedy and public trial." The public trial guarantee was created for the benefit of defendants. *Waller v. Georgia*, 467 U.S. 39, 46, 104 S.Ct. 2210, 2215, 81 L.Ed.2d 31 (1984); *Gannett Co. v. DePasquale*, 443 U.S. 368, 380, 99 S.Ct. 2898, 2905, 61 L.Ed.2d 608 (1979). It discourages perjury and ensures that judges, lawyers and witnesses carry out their respective functions responsibly. *Waller*, 467 U.S. at 46, 104 S.Ct. at 2215; *In re Oliver*, 333 U.S. 257, 270 & n. 25, 68 S.Ct. 499, 506, n. 25, 92 L.Ed. 682 (1948). "Openness in court proceedings may improve the quality of testimony, induce unknown witnesses to come forward with relevant testimony, cause all trial participants to perform their duties more conscientiously, and generally give the public an opportunity to observe the judicial system." *Gannett Co.*, 443 U.S. at 383, 99 S.Ct. at 2907; *see Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 605–06, 102 S.Ct. 2613, 2619–20, 73 L.Ed.2d 248 (1982).

██ The right to a public trial, however, is not absolute and must give way in some cases to other interests essential to the fair administration of justice. *Waller*, 467 U.S. at 45, 104 S.Ct. at 2214; *United States v. Hernandez*, 608 F.2d 741, 747 (9th Cir.1979); *United States ex rel. Latimore v. Sielaff*, 561 F.2d 691, 694 (7th Cir.1977), *cert. denied*, 434 U.S. 1076, 98 S.Ct. 1266, 55 L.Ed.2d 782 (1978).

Federal courts have recognized limitations on that right where a judge has excluded spectators during a witness's testimony for a justifiable purpose. *See Hernandez*, 608 F.2d at 747–48 (to protect wit-

ness from harassment and physical harm); *Sielaff*, 561 F.2d at 695–96 (to protect witness's dignity in rape trial); *United States v. Akers*, 542 F.2d 770, 772 (9th Cir.1976) (to avoid disorder), *cert. denied*, 430 U.S. 908, 97 S.Ct. 1181, 51 L.Ed.2d 585 (1977); *United States v. Eisner*, 533 F.2d 987, 993–94 (6th Cir.), *cert. denied*, 429 U.S. 919, 97 S.Ct. 314, 50 L.Ed.2d 286 (1976) (to protect witness with fear of testifying in public); *United States ex rel. Orlando v. Fay*, 350 F.2d 967, 971 (2d Cir.1965), *cert. denied*, 384 U.S. 1008, 86 S.Ct. 1961, 16 L.Ed.2d 1021 (1966) (to maintain order in the courtroom); *Geise v. United States*, 262 F.2d 151, 155 (9th Cir.1958), *cert. denied*, 361 U.S. 842, 80 S.Ct. 94, 4 L.Ed.2d 80 (1959) (to protect minor witness from embarrassment in rape trial). Courts have upheld partial closure orders narrowly tailored to serve the interests for which they were ordered.

In *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), the Supreme Court addressed for the first time the contours of the criminal defendant's Sixth Amendment right to a public trial. It ruled that the tests set out in *Press–Enterprise Co. v. Superior Court*, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984), governed total closures:

> The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

*Waller*, 467 U.S. at 45, 104 S.Ct. at 2215 (quoting *Press–Enterprise*, 464 U.S. at 510, 104 S.Ct. at 824). The Court held that the closure of the entire suppression hearing violated the defendant's public trial guarantee. 467 U.S. at 48, 104 S.Ct. at 2216.

*Waller* addressed *total* closure of a suppression hearing and does not necessarily govern partial closures. *See, e.g., Jones v. Henderson*, 809 F.2d 946, 951 (2d Cir.1987);

---

evidence. It found that instruction likely to confuse the jury and acted within the limits of its discretion.

*Douglas v. Wainwright*, 739 F.2d 531, 533 (11th Cir.1984), *cert. denied*, 469 U.S. 1208, 105 S.Ct. 1170, 84 L.Ed 2d 321 (1985). In *Press–Enterprise* itself, the Court alluded to the distinction between total and partial closures by stating that when limited closure is ordered, "the constitutional values sought to be protected by holding open proceedings may be satisfied later by making a transcript of the closed proceedings available within a reasonable time." 464 U.S. at 512, 104 S.Ct. at 825.

Finding no cases in this circuit that discuss *Waller* in the context of limited closures, we note that the Eleventh Circuit has applied a more lenient test to partial closures. *Douglas*, 739 F.2d at 533 (upholding its prior decision even after the Supreme Court vacated it and remanded for reconsideration in light of *Waller*). It found that the impact of the partial closure did not reach the level of a total closure, and therefore "only a 'substantial' rather than 'compelling' reason for the closure was necessary." *Id.* (citations omitted). It found further that a "substantial reason— protection of the witness from unnecessary insult to her dignity—existed that justified the partial closure." *Id.* In cases "where only a partial closure is involved, a court must look to the particular circumstances to see if the defendant still received the safeguards of the public trial guarantee." *Id.* at 532; *see Sielaff*, 561 F.2d at 694–95.

■ We conclude that *Waller* is distinguishable from this case. Here we do not have a true "closure" of proceedings, but a temporary exclusion from the courtroom of defendants' families during one witness's testimony. We must determine, in light of the defendants' right to a public trial, whether the trial judge had a substantial reason for the closure. We also must decide whether the closure was narrowly tailored to exclude spectators only to the extent necessary to satisfy the purpose for which it was ordered.

### B. *Bennally's Testimony*

#### 1. *Reason for the Exclusion*

Bennally, the alleged victim and main witness against Charley, became emotional shortly after she began to testify. The prosecutor requested that the courtroom be cleared in order that she might conclude her testimony. He said that she was frightened and apprehensive of speaking before defendants' family members.

The trial judge concluded that the prosecutor could elicit Bennally's testimony if he excluded members of defendants' families from the courtroom. He had observed some of them making faces and giggling during her testimony. He held that, given the nature of the offenses alleged, the age of Bennally (a minor), her apprehension in testifying before the family members and their actions in the courtroom, justifiable reasons existed for excluding them.

■ We hold that the court had the power to order a limited exclusion of spectators during Bennally's testimony. The protection of young victims of sex crimes from the trauma and embarrassment of public scrutiny justifies closing parts of a criminal proceeding. *Press–Enterprise Co. v. Superior Court*, 478 U.S. 1, 9 n. 2, 106 S.Ct. 2735, 2741 n. 2, 92 L.Ed.2d 1 (1986); *Globe Newspaper Co.*, 457 U.S. at 607, 610, 102 S.Ct. at 2622; *see Sielaff*, 561 F.2d at 695 (recognizing that protection of witness's dignity justified exclusion of spectators); *Geise*, 262 F.2d at 156–57 (finding exclusion proper when necessary to elicit testimony from young rape victim).

■ Although we do not condone the removal of family members from the courtroom, we find that the judge's decision, after balancing the rights of the defendants and the protection of a victim witness, satisfied the constitutional requirement that criminal trials remain open to the public. *But see In re Oliver*, 333 U.S. 257, 271–72, 68 S.Ct. 499, 506–07, 92 L.Ed. 682 (1948) (noting that courts have held that defendant at the very least entitled to have his friends, relatives and counsel present). "The right to a public trial 'has always been interpreted as being subject to the trial judge's power to keep order in the courtroom. Were this not so a public trial might mean no trial at all at the option of the defendant and his sympathizers.'"

*Hernandez,* 608 F.2d at 747 (quoting *Fay,* 350 F.2d at 971). Trial judges must control the courtroom and provide a fair forum for the defendant in the search for truth. *See Hernandez,* 608 F.2d at 747; *accord Akers,* 542 F.2d at 772.

### 2. *Scope of the Exclusion*

The closure order was narrowly tailored to protect Bennally and elicit her information. The government initially requested that Bennally's testimony be closed completely. Instead, the court issued a partial closure order, which affected defendants' families only for the duration of her testimony. Those excluded were readmitted thereafter. The trial judge did not exclude the defendants and provided expressly that other members of the public, especially the press, could remain in the courtroom. The jury was not aware of the limited closure order. The transcript of the trial became a public record.

In sum, we find none of the secrecy of the proceedings condemned by the Sixth Amendment. *See In re Oliver,* 333 U.S. at 270–71, 68 S.Ct. at 506–07; *Aaron v. Capps,* 507 F.2d 685, 688 (5th Cir.), *cert. denied,* 423 U.S. 878, 96 S.Ct. 153, 46 L.Ed.2d 112 (1975).

### 3. *Procedural Requirements*

■ Having concluded that the reasons for the closure were substantially justified and that it was narrowly tailored, we must determine if the district court met the procedural requirements for closing the proceedings under Supreme Court and Ninth Circuit law.

Most cases which have discussed procedural requirements have done so in the context of press exclusions under the First Amendment. *See, e.g., Press Enterprise,* 464 U.S. at 510, 104 S.Ct. at 824; *United States v. Brooklier,* 685 F.2d 1162, 1167–68 (9th Cir.1982); *Sacramento Bee v. United States Dist. Court,* 656 F.2d 477, 482 (9th Cir.1981), *cert. denied,* 456 U.S. 983, 102 S.Ct. 2257, 72 L.Ed.2d 861 (1982). Any doubt about whether procedural protections would apply in the Sixth Amendment

context was resolved by *Waller,* where the Court stated:

> [T]here can be little doubt that the explicit Sixth Amendment right of the accused is no less protective of a public trial than the implicit First Amendment right of the press and public.

467 U.S. at 46, 104 S.Ct. at 2215. We conclude that procedural requirements must be met in the context of the partial closure of criminal proceedings. *See also Douglas,* 739 F.2d at 533 n. 2 (although the court required a "substantial" rather than a "compelling" reason in the context of a partial closure, it indicated that procedural requirements must still be met).

There are three procedural requirements. First, the court must hold a hearing on the closure motion. In the First Amendment context, in appeals by news media representatives, we have held that those excluded from the proceeding must be afforded a reasonable opportunity to object. *Brooklier,* 685 F.2d at 1167–68; *Sacramento Bee,* 656 F.2d at 482; *see also United States v. Raffoul,* 826 F.2d 218, 225 (3d Cir.1987) (holding that "a pre-closure hearing should be granted as a matter of right to persons actually present and subject to removal from the courtroom").

■ In this case, we do not have to consider the right of the press and the public to have access to criminal proceedings under the First Amendment. Only the defendants appeal, and base their closure argument exclusively on their Sixth Amendment right to a public trial. We hold that where, as here, First Amendment concerns are not raised, the hearing requirement is met when the court gives the defendant the right to be heard. *See Douglas,* 739 F.2d at 533 n. 2 (an opportunity to be heard is required where "any closure of the trial is contemplated and the defendant objects and requests an opportunity to be heard") (quoting *Douglas v. Wainwright,* 714 F.2d 1532, 1546 (11th Cir. 1983), *vacated and remanded,* 468 U.S. 1206, 104 S.Ct. 3575, 82 L.Ed.2d 874 (1984)).

Second, the court must make factual findings to support the closure. *Waller,* 467 U.S. at 48, 104 S.Ct. at 2216; *Brookli-*

*er,* 685 F.2d at 1168; *Sacramento Bee,* 656 F.2d at 482; *Douglas,* 739 F.2d at 533 n. 2. Third, the court must consider reasonable alternatives to closing the courtroom. *Waller,* 467 U.S. at 48, 104 S.Ct. at 2216; *Sacramento Bee,* 656 F.2d at 482.

 We find that these requirements were met in this case. The defendants were given ample opportunity to be heard. When the government proposed closing the courtroom late in the afternoon on July 23, 1987, Charley's counsel objected. The court indicated that it would study the issue overnight, and take it up again the following morning. On the morning of July 24, a hearing on the matter was held outside the presence of the jury. At that time, Sherlock's counsel joined in Charley's objection, and counsel for Charley explained his objection on the record. Although Charley complains that an *evidentiary* hearing was not held, he requested none, and it was not required in any event. *See Raffoul,* 826 F.2d at 225 (the opportunity to be heard " 'need not take the form of an evidentiary hearing' " and " 'need not encompass extended legal argument that results in delay' ") (quoting *Gannett Co.,* 443 U.S. at 446, 99 S.Ct. at 2939) (Blackmun, J., concurring in part and dissenting in part). Charley's right to be heard was met.

We also find that the court met the requirement that it make adequate factual findings. The court found that some of the defendants' family members peered and giggled at the witnesses and that their presence during Bennally's testimony would cause her trauma and embarrassment. As indicated above, the court's findings were sufficient to allow us to conclude that there was a substantial reason to close the proceedings. The district court's factual findings were adequate.

Whether the court properly considered reasonable alternatives to closure presents some difficulty. After the court stated that it would allow a partial closure only as to the defendants' families, there followed this colloquy between the court and Charley's counsel:

MR. TREBONE: I would also ask the Court to consider as a lesser alternative that the spectators be admonished in some fashion, to behave—if they think there is any chance of misbehavior that they behave in a certain fashion.

THE COURT: I have my order. It seems to me that again we have all the language difficulties and very subtle inferences of that.

Although it is a close question, we find that the court properly considered reasonable alternatives to closure. The trial judge expressed concern with "language difficulties," and rejected the alternative of admonishing the observers to behave. Throughout the trial, the court utilized an interpreter in the Navajo language. While the judge might have made more explicit findings regarding reasonable alternatives, we find no constitutional error.

In sum, we find that the court met the procedural requirements imposed by Supreme Court and Ninth Circuit precedent in imposing a partial closure of the proceedings. Defendants' public trial rights under the Sixth Amendment were not violated.

### III. Failure to Sever

Sherlock claims that the court erred in denying several motions to sever. He relies upon *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and asserts that he was prejudiced by the admission of Charley's statement that allegedly implicated him in the assault of Billie. He further alleges the court erred in refusing to allow him to impeach Charley with a prior assault conviction after that statement was admitted. Sherlock and Charley also claim that their irreconcilable defenses mandated severance.

The court may order a severance when it appears that a defendant may be prejudiced significantly by a joint trial with his codefendant. Fed.R.Crim.P. 14. We review for abuse of discretion for a denial of severance. *United States v. Gonzales,* 749 F.2d 1329, 1333 (9th Cir.1984).

 The defendant must demonstrate that the joint trial "was so manifestly prej-

udicial as to require the trial judge to exercise his discretion in but one way, by ordering a separate trial." *United States v. Abushi*, 682 F.2d 1289, 1296 (9th Cir.1982); *United States v. Escalante*, 637 F.2d 1197, 1201 (9th Cir.), *cert. denied*, 449 U.S. 856, 101 S.Ct. 154, 66 L.Ed.2d 71 (1980).

> He must also show violation of one of his substantive rights by reason of the joint trial: unavailability of full cross-examination, lack of opportunity to present an individual defense, denial of Sixth Amendment confrontation rights, lack of separate counsel among defendants with conflicting interests, or failure properly to instruct the jury on the admissibility of evidence as to each defendant.

*Escalante*, 637 F.2d at 1201. The prime consideration in assessing the prejudicial effect of a joint trial is whether the court may reasonably expect the jury to collate and appraise the independent evidence against each defendant in view of its volume and the court's limiting instructions. *Id.; See United States v. Douglass*, 780 F.2d 1472, 1479 (9th Cir.1986); *United States v. Brady*, 579 F.2d 1121, 1128 (9th Cir.1978), *cert. denied*, 439 U.S. 1074, 99 S.Ct. 849, 59 L.Ed.2d 41 (1979).

### A. Charley's Statement

Charley, who did not testify during the trial, allegedly told an investigator that he saw Billie, who had been with Sherlock, sitting naked in front of the truck. Sherlock noted that he would have to impeach that statement by introducing Charley's prior conviction of assault with intent to rape. Admission of that impeachment evidence, however, would be troublesome in a joint trial. Sherlock moved to sever his trial on that ground before and during tri-

al, but the court denied the motion each time.

■ During the portion of its case devoted to Sherlock, the government called the investigator to testify about Charley's statement. He was called immediately before Sherlock's alleged victim, Billie. Over Sherlock's objection, the court allowed him to testify that Charley told him, "He saw the other girl sitting in the cab of the truck without her clothes, naked." That apparent hearsay came in as an "admission" by Charley. The investigator did not mention Sherlock by name. However, he did identify Billie as the girl in the truck. Sherlock was not allowed to impeach Charley by his prior assault conviction.[4] At the end of the investigator's testimony, the court gave a cautionary instruction on Charley's statement.[5]

The court's jury instructions, delivered before closing argument, repeated the limiting admonitions. Sherlock did not comment on the statement during his closing argument, although he did refer to the flimsy and inconsistent evidence in the case against him. Then in rebuttal, despite the two limiting instructions, the prosecutor emphasized three times that Charley's statement buttressed the government's case against Sherlock. Sherlock moved for mistrial on that ground. The court denied that motion and ruled that the prosecutor's arguments were proper rebuttal in replying to defense counsel's arguments. We disagree.

#### 1. *Bruton Claim*

"[A] defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating confession of a nontestifying codefendant is introduced at

---

**4.** Sherlock also challenges the court's ruling that barred him from impeaching Charley's statement through mention of the prior conviction. We review the decision to admit or exclude evidence for abuse of discretion. *United States v. Rubio*, 727 F.2d 786, 798 (9th Cir.1983). Here, the prejudice that would have resulted from admission of Charley's prior sex offense is beyond question. The conviction was excluded properly under Fed.R.Evid. 403, 609(a). We note, however, that if the trials had been severed, the conviction for impeachment would

have been admissible. This ruling emphasizes the prejudice caused Sherlock by the joint trial.

**5.** "The testimony you heard concerning a statement made by Ronald Charley should be considered only in the case against Mr. Charley. You may not consider it when you are deciding whether the government has proved beyond a reasonable doubt that the other defendant, Arnold Sherlock, committed any crime with which he is charged in the indictment."

their joint trial, even if the jury is instructed to consider the confession only against the codefendant." *Richardson v. Marsh,* 481 U.S. 200, 207, 107 S.Ct. 1702, 1707, 95 L.Ed.2d 176 (1987); *see Bruton,* 391 U.S. at 135–36, 88 S.Ct. at 1627–28. The Court, in its latest treatment of the *Bruton* rule, rejected the "contextual implication" doctrine that required a court to assess whether, in light of all of the evidence, a codefendant's confession was so powerfully incriminating that a new, separate trial was required for the defendant. *Richardson,* 481 U.S. at 206, 107 S.Ct. at 1706. It held that the rule is limited to facially incriminating confessions.

In *Richardson,* the Court also found that redaction can serve to eliminate any *Bruton* problems. *Id.* at 209, 107 S.Ct. at 1708; *see United States v. Yarbrough,* 852 F.2d 1522, 1537 (9th Cir.), *cert. denied,* 488 U.S. 866, 109 S.Ct. 171, 102 L.Ed.2d 140 (1988). There the defendant Marsh objected to the admission of a codefendant's extrajudicial statements that incriminated her because it provided the only direct evidence of her specific intent to commit armed robbery. The Court held that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but

any reference to his or her existence." 481 U.S. at 211, 107 S.Ct. at 1709.

The Court, however, found that the prosecutor had erred by seeking to undo the limiting instruction by urging the jury to use the redacted statement in evaluating the codefendant's case.[6] *Id.* Although the prosecutor had cautioned the jury not to use the codefendant's confession against Marsh, he later linked her to the redacted statement by referring to it in the case against her.

Here, we question whether Charley's statement clearly inculpated Sherlock on its face during the investigator's testimony. The prosecutor redacted the statement to exclude Sherlock's name. The investigator did not mention that Sherlock was in the truck with Billie. The statement did not incriminate him unless linked with other evidence introduced at trial. Under *Richardson,* the prosecutor did not violate Sherlock's Sixth Amendment rights.

2. *Court's Discretion To Order Severance*

 As in *Richardson,* however, the statement's prejudicial effect became clear during closing argument when the prosecutor flouted the limiting instructions and urged the jury to consider it in connection with his case against Sherlock.[7] To show that the court abused its discretion in deny-

6. It is unclear whether the prosecutor's subsequent misuse of the nontestifying codefendant's statement presents a *Bruton* problem or whether there is prosecutorial misconduct, which is not necessarily a *Bruton* error, that warrants a new trial.

Since *Richardson,* at least one state court has relied upon it in reversing a conviction for a *Bruton* error. *People v. Cruz,* 121 Ill.2d 321, 117 Ill.Dec. 907, 521 N.E.2d 18, *cert. denied,* 488 U.S. 869, 109 S.Ct. 177, 102 L.Ed.2d 146 (1988). In *Cruz,* a statement of the nontestifying codefendant was admitted with the name of Cruz readacted as well as Cruz's statements. The prosecutor in closing argument encouraged the jurors to consider the codefendants' statements against each other. The court found that the jury could not follow the court's limiting instructions when the prosecution encouraged the jurors to consider each codefendant's admission against the other and that the prosecutor's actions were a "deliberate and constitutionally unacceptable at-

tempt by the prosecution to circumvent the strictures of *Bruton* and the Confrontation Clause." 117 Ill.Dec. at 923–24, 521 N.E.2d at 23–24 (citations omitted).

7. In response to comments by Sherlock's counsel that the government's case was burdened with many inconsistencies, he stated, "Earl White saw Thomascita Billie naked. There was a statement that Officer Yazzie took of Ronald Charley that he saw Thomascita Billie naked." A few moments later, he stated, "If you believe the story or the statement that was read of Ronald Charley that he saw Thomascita Billie naked in the cab of the truck ..." Later, he explicitly told the jury, "[Counsel for Sherlock] stated that Arnold Sherlock could not be guilty, given the government's witnesses. Well, there wasn't just the rape victim here, Thomascita Billie, ladies and gentlemen. We also have the testimony of Earl White, Jr. who saw her naked and Ron Charley's statement that came in with Officer Yazzie's interview, that he also saw her naked by the truck."

ing severance, defendant must show prejudice from the joint trial of such magnitude that he was denied a fair trial. *Escalante,* 637 F.2d at 1201. He must show that he "suffered compelling prejudice against which the trial court was unable to afford protection." *U.S. v. Romanello,* 726 F.2d 173, 177 (5th Cir.1984). Here, the court failed to instruct the jury properly about Charley's statement after the prosecutor's comments. We find that the prosecutor's actions, and Sherlock's inability to cross-examine Charley, significantly prejudiced Sherlock.

The theory underlying *Richardson's* holding is that jurors generally follow limiting instructions, a "rule ... rooted less in the absolute certitude that the presumption is true than in the belief that it represents a *reasonable practical accommodation* of the interests of the state and the defendant in the criminal justice process." *Id.,* 481 U.S. at 211, 107 S.Ct. at 1709 (emphasis added). Here the government violated that pragmatic accommodation. The prosecutor's use of Charley's "admission" against Sherlock reveals that the trial was so complicated that not even he could apply the limiting instructions or that he understood, and intended, his misconduct.[8] Although the court gave the limiting instructions *before* closing argument, no instructions followed the prosecutor's prejudicial remarks. The latter's improper use of the statement removed any reasonable expectation that the jury would follow the instructions given before argument.

Also, the record supports the conclusion that the prosecutor's misconduct or mistake significantly prejudiced Sherlock. Billie's testimony that she had been raped by Sherlock was attacked based on many prior inconsistent statements. Corroboration of her testimony came only from statements made by White and Charley. White was impeached with a prior felony conviction, his dismissal with prejudice in exchange for testimony, and his bias as Charley's friend. Two other witnesses testified that nothing had happened to Billie. Thus, the only unimpeached corroboration for Billie's testimony was Charley's statement. Further, the inability of Sherlock to impeach Charley bolstered the credibility of Billie's testimony. He was denied the opportunity to cross-examine Charley on a statement that eventually implicated him.

For Sherlock, "fundamental conceptions of justice" and "fair play" were lost by trial's end.[9] We conclude that the court abused its discretion by denying his motions for severance. The joint trial was so manifestly prejudicial as to require the court to order a separate trial. *See Abushi,* 682 F.2d at 1296. It at least should have declared a mistrial. *See United States v. Toomey,* 764 F.2d 678, 681 (9th Cir.1985) (mistrial granted when it is more probable than not that the error materially affected the verdict), *cert. denied,* 474 U.S. 1069, 106 S.Ct. 828, 88 L.Ed.2d 799 (1986).

### B. Antagonistic Defenses

■ Sherlock and Charley also argue that the court erred in denying their motions to sever because their defenses were mutually antagonistic. To obtain severance based on that ground, defendants must show that "the acceptance of one party's defense will preclude the acquittal of the other party." *United States v. Ramirez,* 710 F.2d 535, 546 (9th Cir.1983).

---

**8.** In addition to the *Bruton* error, Sherlock argued that the statement, if admitted merely to place Charley at the scene of the alleged crimes, was cumulative. Its prejudicial effect to Sherlock greatly outweighed its minimal probative value. In response to Sherlock's objection, the prosecutor argued that Charley's statement had no relation to Sherlock's case. "There was no inculpation of any of the defendants.... It is not cumulative for the reason that [Charley] states that he saw Arnold Sherlock and Thomascita Billie with her pants down in the truck and nothing has come out in regards to that before in this trial." We note that these comments perhaps reflected his intent to use the statement for more than an "admission" by Charley.

**9.** Also, defendants' contrary cross-examinations and treatments of witnesses Smith, T. Sherlock and White at trial support our finding that the court erred in denying Sherlock's motion to sever. *See* III.B. Some of the prosecutor's additional comments at closing argument also prejudiced Sherlock. *See* IV.A.2. These factors support, but alone do not require, reversal of Sherlock's conviction.

Antagonism between defenses is insufficient; the defenses must be antagonistic to the point of being irreconcilable and mutually exclusive. *Id.* at 546; *see United States v. Adler,* 862 F.2d 210, *amended and superceded,* 879 F.2d 491 (9th Cir. 1988); *United States v. Polizzi,* 801 F.2d 1543, 1554 (9th Cir.1986); *United States v. Romanello,* 726 F.2d 173, 177 (5th Cir. 1984). The defendant must show that "[t]he essence or core of the defenses must be in conflict such that the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other." *Romanello,* 726 F.2d at 177; *United States v. Lee,* 744 F.2d 1124, 1126 (5th Cir.1984).

■ Here the court found that Sherlock and Charley based their defenses on claims that they did not commit the alleged crimes. It concluded that the testimony of witnesses placed both at the scene of the crime, each with a different victim at about the same time. The defense that Sherlock did not rape Billie did not preclude the conclusion that Charley did rape Bennally. Thus, it ruled that the defenses were not mutually exclusive.

■ The defendants argue, however, that the jury, in order to believe the core of testimony offered on behalf of Sherlock, must have disbelieved the testimony offered on behalf of Charley.[10] We have examined carefully the entire trial transcript and find their claims to be overstated. Although each defendant took an adversarial stance as to some witnesses who testified favorably for the other, the core of each defense was not so antagonistic as to be mutually exclusive. The mere presence of hostility among defendants or the desire of one to exculpate himself by inculpating the other does not generate the kind of prejudice that mandates severance. *United States v. Hendrix,* 752 F.2d 1226, 1233 (7th Cir.), *cert.*

*denied,* 471 U.S. 1021, 105 S.Ct. 2032, 85 L.Ed.2d 314 (1985); *see Lee,* 744 F.2d at 1126; *United States v. Berkowitz,* 662 F.2d 1127, 1134 (5th Cir.1981). Considering the testimony offered by each defendant, the jury could have believed that both, neither, or only one of the men had committed the alleged acts. The defense of one did not necessarily indicate the guilt of the other.

Further, the underlying purposes of the rule requiring severance based on irreconcilable defenses were not implicated here. The primary danger that the rule seeks to avoid is a defendant faced with two prosecutors—the government and his codefendant. *Lee,* 744 F.2d at 1126. Examination of the record does not convince us that each counsel played the role of a second prosecutor. Each directed his examination of witnesses toward establishing the innocence of his client and not the guilt of the other. *See United States v. Stotts,* 792 F.2d 1318, 1321–22 (5th Cir.1986) (defenses not mutually antagonistic where no defendant alleged that the other was guilty).

Their defenses focused on the failure of the government to prove guilt and emphasized the inconsistent stories given by the alleged victims and witnesses. In the few instances where inculpatory evidence emerges against the other defendant, the testimony elicited was merely cumulative. We find that those isolated attacks do not create the compelling prejudice necessary to mandate a severance. *See, e.g., United States v. Carrion,* 809 F.2d 1120, 1126 (5th Cir.1987) (no compelling prejudice where counsel maintained his focus on client). We conclude that the defenses raised by Sherlock and Charley were not so irreconcilable as to be mutually exclusive. *See Berkowitz,* 662 F.2d at 1134 (finding that defenses, noninvolvement in the criminal activity, not mutually exclusive).

10. In essence, in Charley's defense, White testified that (1) he was with Charley the whole time; (2) he never saw Bennally naked; (3) he saw Billie naked; and (4) he saw Charlie help Billie look for her pants. On the other hand, in Sherlock's defense, Smith and T. Sherlock both testified that (1) Charley had attacked Bennally; (2) Sherlock had helped Bennally look for her pants after her attack. In addition, Bennally testified that she saw Sherlock and Billie in the truck together before she left to go to the bathroom when Charley attacked her. Billie testified that after her alleged rape, she looked for Bennally and found her without any pants.

## IV. Other Claims of Error

### A. Prosecutorial Misconduct

Sherlock and Charley claim that prosecutorial misconduct, in addition to the misuse of Charley's extrajudicial statement, denied them a fair trial. Our review of the entire record convinces us that no other reversible misconduct occurred.

### 1. Presentation of Perjured Testimony

■ "A conviction obtained by the knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could have affected the.outcome of the trial." *United States v. Polizzi*, 801 F.2d 1543, 1549 (9th Cir.1986); *see United States v. Bagley*, 473 U.S. 667, 678–80, 105 S.Ct. 3375, 3381–83, 87 L.Ed.2d 481 (1985); *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 341, 79 L.Ed. 791 (1935). Reversal will be required when the prosecution knowingly presents false testimony. *See United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976); *Brown v. Wainwright*, 785 F.2d 1457, 1464–66 (11th Cir.1986).

■ Sherlock and Charley assert that the prosecutor, by presenting witnesses with contradictory stories, necessarily presented perjured testimony. That argument lacks merit. They fail to allege that the prosecutor knew which story was true or false. Without knowledge of whose testimony was false, he could not have *knowingly* presented perjured testimony. *See United States v. Rovetuso*, 768 F.2d 809, 818 (7th Cir.1985), *cert. denied*, 474 U.S. 1076, 106 S.Ct. 838, 88 L.Ed.2d 809 (1986); *accord United States v. Baker*, 850 F.2d 1365, 1371 (9th Cir.1988). The record does not show and we do not presume that the prosecutor used false testimony.

### 2. Prosecutor's Comment

■ In his rebuttal argument, the prosecutor stated, "We neither try to convict the innocent nor allow the guilty to go

free." Defendants objected outside the jury's presence. "Prosecutorial comments to which defendant objects are reviewed for 'harmless error'." *United States v. Endicott*, 803 F.2d 506, 513 (9th Cir.1986) (citation omitted). We must decide whether the prosecutor's statement, when considered in the context of the entire trial, affected the jury's ability to judge the evidence fairly. *United States v. Young*, 470 U.S. 1, 19–20, 105 S.Ct. 1038, 1048–49, 84 L.Ed.2d 1 (1985); *United States v. McKoy*, 771 F.2d 1207, 1212 (9th Cir.1985).

In *Hall v. United States*, 419 F.2d 582, 587 (5th Cir.1969), the court reversed a conviction for prosecutorial misconduct in argument that included a statement that "we try to prosecute only the guilty."

> The statement "we try to prosecute only the guilty" is not defensible. Expressions of individual opinion of guilt are dubious at best.... This statement takes guilt as a predetermined fact. The remark is, at least, an effort to lead the jury to believe that the whole governmental establishment had already determined appellant to be guilty on evidence not before them.... Or, arguably it may be construed to mean that as a pretrial administrative matter the defendant had been found guilty as charged else he would not have been prosecuted.

*Id.*

The statement is incompatible with the presumption of innocence. *See United States v. Cummings*, 468 F.2d 274, 278 (9th Cir.1972). It is pure prosecutorial misconduct. "[I]t is always improper for a prosecutor to suggest that a defendant is guilty merely because he is being prosecuted or has been indicted." *United States v. Bess*, 593 F.2d 749, 754 (6th Cir.1979).

We find that the prosecutor erred in suggesting that defendants were guilty because they were being prosecuted. However, we hold that the statement in context would support, but does not require, reversal.[11] In the context of the entire trial, the

---

**11.** The prosecutor stated, "My job, my purpose in being here is to get to the truth and through that truth to see that justice is done.

We neither try to convict the innocent nor allow the guilty to go free. These are matters

prosecutor's misconduct did not affect the jury's ability to judge the evidence fairly.

### B. Hearsay Testimony from Nez

■ Charley objected to admission of testimony by Nez, who was the roommate of Billie and Bennally at the time of the alleged crimes. The testimony included statements that the girls had informed Nez that they had been raped. The court admitted that hearsay under the excited utterance exception. Fed.R.Evid. 803(2). We review for abuse of discretion. *United States v. Cowley,* 720 F.2d 1037, 1040 (9th Cir.1983), *cert. denied,* 465 U.S. 1029, 104 S.Ct. 1290, 79 L.Ed.2d 692 (1984).

Billie made her statement approximately one hour after the assault. Bennally made her statement even later. Both had spoken to several persons before telling Nez they had been raped. They had time to think about their actions and to invent an excuse about their late arrival at the dorm with alcohol on their breath. The hearsay statements do not fall under the scope of the excited utterance exception. *See United States v. McLennan,* 563 F.2d 943, 948 (9th Cir.1977) (declarant must be so excited or distraught that he did not reflect on what he was saying), *cert. denied,* 435 U.S. 969, 98 S.Ct. 1607, 56 L.Ed.2d 60 (1978).

■ Even if the statements do not come within a hearsay exception, their admission was harmless. At least two other witnesses testified that the girls had told them they had been raped.[12] We conclude that even if admission of Nez's testimony was erroneous, it is not ground for reversal.

### C. Jury Instruction on Credibility

■ Finally, defendants claim that the court erred in refusing their instruction on

the credibility of witnesses. They argue that this denied them their theory of defense, which was that the victims' stories were lies. *See United States v. Ibarra–Alcarez,* 830 F.2d 968, 973 (9th Cir.1987) (defendant entitled to an instruction covering the defense theory with a legal basis and some evidentiary support); *United States v. Escobar de Bright,* 742 F.2d 1196, 1201 (9th Cir.1984) (failure to instruct jury on a defense theory that is legally sound and supported by the evidence is *per se* reversible).

They offered an instruction that the jury might discredit all of a witness's testimony if it found the witness had lied on a material issue. The court instead gave this circuit's pattern instruction dealing with witness credibility. It instructed the jury that they could "disbelieve all or any part of any witness's testimony." That instruction allowed the jury to adopt the defendants' theory of the case. "It is not error to refuse a proposed instruction if the other instructions, when viewed in their entirety, cover that theory." *Ibarra–Alcarez,* 830 F.2d at 973; *United States v. Hayes,* 794 F.2d 1348, 1351 (9th Cir.1986), *cert. denied,* 479 U.S. 1086, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987). The court did not abuse its discretion in refusing defendants' proposed instruction and in giving this circuit's model instruction.

CONCLUSION

We REVERSE Sherlock's conviction and remand for a new trial. WE AFFIRM Charley's conviction.

The mandate will issue now.

POOLE, Circuit Judge, Dissenting:

After reviewing the proceedings in this case in light of the petition for rehearing, I

---

for you to decide through the testimony of the witnesses, whatever that testimony might be.

And the Government is not asking you, ladies and gentlemen, to smoke anything or to buy any wares or do any gambling in this case.

We expect that you will base your decision in this case on the evidence and the testimony that you have heard from the witnesses over the course of the last two weeks."

12. A third witness, Ms. Clitso, testified that the girls told her they had been raped. That came

in only as *impeachment* evidence (through prior inconsistent statement questioning) which the prosecutor was allowed to develop, over defendant's objections, against his own witness. The court denied the motion for mistrial. In rebuttal argument the prosecutor again referred to Ms. Clitso's testimony that the girls said they had been raped. The prosecutor's misconduct, however, does not require reversal.

am convinced that a mistake has been made that cannot be cured by the mere change of nomenclature represented by the majority's amendments to the opinion. To alleviate what the judge and prosecutor deemed the victim-witness's distress at having to go through the ordeal of recounting her experience before the defendant's family members, the judge expelled the family members from this portion of the proceedings. From some experience, I share the judge's concern. But I know also that a trial judge has many means of controlling the behavior of spectators short of banishment from the public courtroom.

The majority's amendments to the opinion in response to this concern are a nostrum premised on a faulty conclusion: "The closure order was narrowly tailored to protect Bennally and elicit her information." I disagree, and the summary application of this label ignores the principles which call for a forewarning by the trial judge—an effort to maintain order through less drastic means than the expulsion of friends and family. Attendees cannot be simply thrown out of the courtroom unless the judge can make supportable findings that order can not be maintained through less drastic means. *Waller v. Georgia,* 467 U.S. 39, 48, 104 S.Ct. 2210, 2216, 81 L.Ed.2d 31 (1984).

Charley's family members were given no admonishment about maintaining the requisite decorum, no second chance. In fact, they were given no sign that the judge felt any need to demand order before expulsion. There is no indication that decorum could not have been maintained by some less drastic step and, contrary to the majority's amendments, no indication that the judge considered less drastic alternatives. There was not the slightest effort to confine sanctions or threats of sanctions to the specific individuals who might be deemed the responsible actors. An experienced judge should be expected to use all measures necessary for order and decorum— and no more.

Finally, in its examination of the procedural propriety of the closure order the majority cites to *Press Enterprise, Brook-* *lier* and *Sacramento Bee,* all of which involve the exclusion of the press from trials. The press brings to the absent public the narrative of the trial. The family and friends of the defendant are part of the very public whose interest in presence is protected. Thus, the considerations which must be serviced in admitting the press, public and family are similar but not identical, and stem from different sources. Our case law treatment of free press/fair trial in no way explains why unwarned family or friends, spectators from the body public, should be ousted from an otherwise public trial.

Because the expulsion order in this case was precipitous, not supported by the record, and shut off access where access is vital, not only to the miscellaneous defendant or spectator but to the institution, I respectfully dissent from the majority's amended opinion.