145 P.3d 886

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Duane SWANSON, Defendant–Appellant.**

**No. 27120.**

Intermediate Court of Appeals of Hawai'i.

Oct. 11, 2006.

---

Jon N. Ikenaga, Deputy Public Defender, on the briefs, for defendant-appellant.

Arleen Y. Watanabe, Deputy Prosecuting Attorney, County of Maui, on the briefs, for plaintiff-appellee.

LIM, Presiding Judge, FOLEY and NAKAMURA, JJ.

Opinion of the Court by LIM, J.

Duane Swanson (Defendant) appeals the December 21, 2004 judgment of the Family Court of the Second Circuit (family court)[1] that convicted him, upon a jury's verdict, of two counts of violating an order for protection.[2]

---

1. The Honorable Joseph E. Cardoza presided.

2. Hawai'i Revised Statutes (HRS) § 586–4(a) (Supp.2005) provides:

    (a) Upon petition to a family court judge, an ex parte temporary restraining order may be granted without notice to restrain either or both parties from contacting, threatening, or physically abusing each other, notwithstanding that a complaint for annulment, divorce, or separation has not been filed. The order may be granted to any person who, at the time the order is granted, is a family or household member as defined in section 586–1 or who filed a petition on behalf of a family or household member. The order shall enjoin the respondent or person to be restrained from performing any combination of the following acts:

    (1) Contacting, threatening, or physically abusing the protected party;
    (2) Contacting, threatening, or physically abusing any person residing at the protected party's residence; or
    (3) Entering or visiting the protected party's residence.

HRS § 586–5.5(a) (Supp.2005) provides, in pertinent part:

    . (a) If, after hearing all relevant evidence, the court finds that the respondent has failed to show cause why the order should not be continued and that a protective order is necessary to prevent domestic abuse or a recurrence of abuse, the court may order that a protective order be issued for a further fixed reasonable period as the court deems appropriate.

    The protective order may include all orders stated in the temporary restraining order and may provide for further relief as the court deems necessary to prevent domestic abuse or a recurrence of abuse[.]

HRS § 586–11(a) (Supp.2005) provides, in pertinent part:

    (a) Whenever an order for protection is granted pursuant to this chapter, a respondent or person to be restrained who knowingly or intentionally violates the order for protection is guilty of a misdemeanor.

Defendant contends the family court violated his federal and State constitutional rights to a public trial by allowing the jury to deliberate, communicate and return its verdict after normal business hours, when the courthouse was closed to the public. We disagree, and affirm.

## I.

In count one, the amended complaint charged Defendant with violating a five-year order for protection still in effect on December 22, 2003, by contacting and/or being within one hundred yards of the residence of the complaining witness (the CW). In counts two through six, the amended complaint charged Defendant with violating the order by telephoning the CW on December 4, December 7, December 16, December 16 again, and December 19, 2003, respectively.

As to count one, the CW remembered that on December 22, 2003, Defendant came to her house and tried to speak with her. Defendant left when the CW called 911. While the police were at the house writing up a report, Defendant telephoned the CW twice, asking, "Can we talk?"

As to counts two through six, the CW testified that she saved Defendant's telephone messages on her cell phone voice mail:

Q (By [the deputy prosecuting attorney (DPA)]) When was the first time that you received a message on your voicemail that was recorded from the defendant?

A December 4th.

Q Okay. And did you keep—what do you do with that message?

A I saved it.

Q Did you receive any further phone call, voicemail messages from the defendant?

A Yes, I did.

Q Do you recall when those were?

A Well, I know that two of them were on the 16th of December. And there were two others that I don't have the dates exactly in front of me.

Q When you—well, how many phone calls all together were there?

A May I please ask a question?

Q How many phone messages were there that were recorded our [ (sic) ] voicemail?

A Five.

Q You say that there were two on December 16th, 2003?

A I do believe so.

Q Were there any after that?

A I don't remember.

. . . .

Q And what did you do with those messages that you had?

A I saved them. And I had called the police department and asked if they could be recorded as evidence of violation of this order. And Captain Ribao came to my home and recorded those messages on tape off of my phone.

After *voir dire* and over the objection [3] of defense counsel, the family court admitted into evidence the audiotape of Defendant's voice mail messages to the CW, as Exhibit 5. The audiotape was played in court for the jury.

The first message opened with Defendant crooning the Elvis hit, "Are You Lonesome Tonight," then saying,

(Indiscernible.) I'm thinking of you. Please call me. I love you, Gail, I'm glad you're back. Hope your trip was fine. Talk to me. It won't hurt. It won't hurt at all, I promise. (Indiscernible.) Please give me a call. Whenever you feel like it. I love you. Bye.

Defendant's second message was,

Good morning. Um. How are you today? Just—I always think about you in the morning, and just felt like saying hi this morning. Hi. (Laughs.) Just wanted you to know I'm thinking about you and I care about you. It would mean so much to me to talk to you sometime. So, if you ever feel an urge to make a little man happy, I

---

**3.** "Your Honor, I object. I think the custodians [ (sic) ] of records should be the person laying the foundation, not the witness. Objection."

would love to get a call. God bless you. Have a wonderful day.

The third message was accompanied by background music, with Defendant singing along sporadically then saying,

I miss you. I love you. Oh, I miss you so much. I want to give you your Christmas present. I, uh, love you. Bye.

The fourth message was rather soft and obscure, but for the most part intelligible:

Hi Gail. Hey, Milagros is closing down and (indiscernible) have a big party tonight. And I just wanted you to know that you're invited, so come on down if you'd like to have some fun. And your hair sure looks nice. I like it getting long like that. It's good seeing you today. Merry Christmas. Bye.

The fifth message:

Hello. Well, I'm sure you're busy with your holidays. Um. But if you're not, I'm having a party at my house tonight with some of my friends, and, uh, you're invited. If you happen to be down this way, please stop by. If not, happy holidays. Merry Christmas to you.

There was a sixth and last message on Exhibit 5, identical in all respects to the fourth.

Captain Ribao later testified about the recording of Exhibit 5. On direct, he remembered:

A I met with [the CW]. This was just before 3:00 that day. Just before 3:00 in the afternoon. I then—I had a hand-held tape recorder and I tape-recorded the five messages that were on her cell phone.

. . . .

Q And did you make any, I guess, audio observations about the voice on all five calls?

A It appears that the voice was from the same person.

Q When you listened to the messages, did you hear any date or time stamp on the messages?

A No. That couldn't be determined. We tried to do that through the cell phone, but we couldn't do that.

On cross, Captain Ribao tried to further explain:

Q Okay. I note that some of those messages are cut off, you know, at the very end of a message, it has end of message, there's a little tag on them; isn't that true?

A I don't know what you [ (sic) ] talking about.

Q Did you put on the tape recorder and go through all the messages simultaneously without turning off the tape machine?

A I think I turned the tape machine off after each message.

. . . .

Q Wouldn't you think that if you let the tape roll continuously from top to bottom, you would have some information from any messages as to when it was received?

. . . .

A Prior to taping, I listened to all of the messages, one after the other. There was no voice—no time stamp or date stamp after each message.

Q And it was each message one to five all continuously, true?

A Again, I don't recall that. But I believe that is what I did. I listened to all of the messages one to five.

. . . .

Q . . . When you—it was [the CW] who retrieved the messages and handed the phone to you; is that correct?

A At first. When she first went into her messaging system, she—she did that. But afterwards, I could do it myself, retrieve the messages myself.

Q How many messages were on her voicemail?

A Total.

Q In total?

A I don't know.

Q So it's fair to say that there were more than the taped messages that you actually ended up taping, true?

A I don't think that is fair to say. I said I don't know. They may have been just that five that I tape-recorded. I am not sure.

Q So [the CW] is the one who turned to you or retrieved the messages and gave it to you to listen?

A [The CW] went, like I said, for the third time now. She went to the messaging system, handed me the phone and I listened to the messages. Then I, after listening to the messages, I tape-recorded them. I played them again and I tape-recorded them.

Q But you admit, though, that you turned on the tape after each message, correct?

A I believe that is what I did, yes.

. . . .

Q And you can't tell, for example, if there were like ten messages on the cell retrieval and you only taped five of the ten; isn't that right?

A That is correct.

. . . .

Q . . . So you just relied upon [the CW] to tell you to tape five messages and each of those messages you could not determine the date or the time when they were received, true?

A Again, she went into her messaging system. I listened to the messages. From what I recall those were the only five messages on her phone. I am not sure, again, but I believe they were the only five messages on her voicemail. I listened to them and I taped the five messages.

Q And as you wrote in the report, there is no way to determine when they are made, correct?

A Exactly.

During the afternoon of the last day of trial, October 25, 2004, the family court instructed the jury. Among its instructions were the following:

The defendant is charged with more than one offense under separate counts in the complaint. Each count and the evidence that applies to that count is to be considered separately. The fact that you may find the defendant not guilty or guilty of one of the counts charged does not mean that you must reach the same verdict with respect to any other count charged.

. . . .

The law allows the introduction of evidence for the purpose of showing that there is more than one act upon which proof of an element of an offense may be based. In order for the prosecution to prove an element, all twelve jurors must unanimously agree that the same act has been proved beyond a reasonable doubt.

After closing arguments but before deliberations, the family court reminded the jury that, once it had reached its verdicts, "court will be reconvened to receive the verdicts."

As the family court was about to excuse the alternate juror, a sitting juror spoke up:

THE COURT: We are at the stage of the proceeding where we'll excuse our alternate juror. Before I do that, I typically check with the first 12 jurors. The reason I do that is once we excuse the alternate juror, we are not able to call the alternate juror back to deliberations. That's not permitted by the rules that we operate under.

So if anyone has anything they need to bring to the Court's attention at this time, please do so by raising your hand. If not, I'll be excusing the alternate juror.

Yeah, we have one hand. Yes, we have the juror in seat number four, Mr. . . . .

JUROR: I cannot come back tomorrow.

THE COURT: All right. How about Wednesday? Are you free?

JUROR: I don't know. My job is day to day.

THE COURT: Oh, I see.

JUROR: I can come in the morning, but I got to leave by 12.

THE COURT: Are you able to deliberate past 4:30 today?

JUROR: Yeah.

THE COURT: Is anyone not able to do that? We have two—the jurors seated in seats six and 12.

THE COURT: Counsel, please approach.

(At which time a bench [ (sic) ] outside of the hearing of the jury.)

THE COURT: This is what we're going to try to do, ladies and gentlemen. This is somewhat unprecedented, but with the our [ (sic) ] second—who was originally our second alternate, but our remaining alternate instead of discharging you at this point, if it's all right with you, we'll have you stand by, just in case we may have to devise a procedure here if something unusual occurs. And hopefully we won't have to cross that bridge. All right. But is that all right with you?

JUROR: Yeah.

As the family court was in the very act of sending the jury to deliberations, another juror's hand went up:

JUROR: When you say unanimous verdicts reached, there has to be a unanimous verdict on each of the separate counts?

THE COURT: That is correct, yes. The vote—in order for there to be a verdict, there needs to be 12 zero on each—

JUROR: On each of the counts.

THE COURT: And I gave you an instruction with respect to—how you consider that and essentially or the defendant—the defendant is charged under more than one offense in separate counts of the complaint. Each count and the evidence that applies to that count is to be considered separately.

During its deliberations, the jury sent the family court a number of communications. The first was sent at 4:45 p.m.:

We need a tape player to hear the tape recorded evidence.

The family court responded at 5:24 p.m.:

The bailiff will bring a tape player into the jury room and play the tape recorded evidence as many times as you request. Please do not deliberate in the presence of the bailiff.

The second jury communication, concerning matters immaterial to this appeal, was sent at 5:05 p.m. and answered at the same time as the first. While it was formulating the two responses with counsel,[4] in court and on the record,[5] the family court noted:

Thank you very much and I'll ask you to please stand by inasmuch as the jurors have decided to stay past 4:30 and deliberate. That obviously was of a surprise to the Court, but that's what they wanted to do. Please stand by. Thank you very much.

A third communication was sent at 6:55 p.m.:

(1) Can we ask questions of the two attorneys? This is lieu [ (sic) ] of the phone calls placed.

(2) Can we have an after supper smoke break?

The family court reconvened to discuss the third communication with counsel and sent an agreed-upon response at 7:14 p.m.:

1. No, questions cannot be asked of the attorneys.

2. Yes, you may have a smoke break.

A fourth communication came at 7:10 p.m.:

Can we get clarification on the voicemail order with the dates on the seperate [ (sic) ] charges? We have no dates on record from our notes. How do the voicemail dates coincide with the 12/4–12/19 charges?

The family court reconvened with counsel and an agreed-upon response was sent at 7:34 p.m.:

During the course of the trial, you have received all of the evidence you may consider to decide the case. Therefore, please rely on your individual and/or collective memory of the evidence.

In a fifth communication, signed by the foreperson at 7:30 p.m. and received by the family court at 7:37 p.m., the jury announced that it had reached a verdict. The family court reconvened with Defendant, counsel and the jury to receive the verdict. The family court informed those present that the proceedings were being videotaped. After a jury poll, the family court found the verdict to be unanimous. The jury found Defendant

4. Defendant was present in court each time the family court reconvened to discuss with counsel appropriate responses to the jury communications.

5. The evening proceedings were videotaped.

not guilty in counts one, two, three and six, and the family court acquitted him of those charges. The jury found Defendant guilty in counts four and five.

On November 4, 2004, Defendant filed a motion for judgment of acquittal and/or new trial. In it, Defendant raised a number of issues, two of which survive to grace this appeal. Both, Defendant averred, were grounds for a new trial:

First, the jury deliberations occurred after courthouse business hours, thereby violating Defendant SWANSON's constitutional right to a public trial. Second, State's Exhibit 5 consists of six, not five, alleged telephone calls from Defendant SWANSON, contrary to the prosecution's representations and theory of its case.

As to the first ground, Defendant represented:

At about 4:40 p.m., the trial court requested defense counsel to return to the courthouse because the jury had a question. The court bailiff met both defense counsel ... and the prosecutor at the courthouse parking structure to provide counsel access to the courthouse because it was locked and closed after hours.

Defendant added, "Indeed, even co-counsel was unable to attend the proceedings because it had occurred after business hours." Co-counsel declared:

On Monday, October 25, 2004, between the hours of about 5:00 p.m. and 7:00 p.m., I understood that the jury had forwarded a few questions to the court. At around 7:30 p.m. or shortly thereafter, my daughter and I tried to gain access to the courthouse to assist my client and co-counsel with the trial proceedings.

However, I was unable to attend the trial proceedings because the courthouse was locked and secured.

(Enumeration omitted.) As to the second ground, Defendant explained, "This plain error created manifest injustice because it is impossible to determine what evidence the jury considered in reaching its verdicts of guilty." (Footnote omitted.)

Among other points in opposition, the State attached to its papers the declaration of the DPA:

The bailiff then called Declarant to come to the courthouse elevators to be escorted to the courtroom to discuss some communications from the jury;

The bailiff met Declarant, defense counsel ..., and Defendant on parking level 5 to take us up to the courtroom as the public elevators were shut down for the evening;

Between the time that Declarant first returned to the courthouse with defense counsel and Defendant and the time that the verdict was read into the record by the court clerk, another person was able to gain entry into the courthouse; and

Declarant had communicated with that other person by phone and made arrangements to have the bailiff escort him to the courtroom, where he was present when court was reconvened for the reading of the verdict;

Declarant is not aware of any other requests by Defendant or defense counsel to have any other individual brought up to the courtroom.

(Enumeration omitted).

After hearing arguments on Defendant's motion, the family court rendered an oral ruling. The following are its remarks on the issues outlined above:

THE COURT: All right. The Court having considered the written submissions of the parties as well as the oral arguments on the motion—I think one area that I should comment on deals with the jury deliberations and the return of the verdict.

This Court's policy is to recess deliberations at 4:30 and to have the jury return the next day. And in this particular instance it was not the Court's decision to have the jury remain. This was a product of the jury's own process, and I think the Court, considering the sacrifices that we ask jurors to make in terms of their time, employment and other concerns, defers to the jury, and that rarely occurs here, but it does occur on occasion, rare occasion.

In this particular—in this case as the parties are aware, I had intended to have the deliberations recess at—end for the day at—and to have the jury come back the next day. But the jury remained in the—remained and instead began to send communications to the Court.

Second, with respect to juror communications, this Court does not close those proceedings off to the public. I want you folks to understand that. As an accommodation to counsel, I'm often asked if we can do—handle that in a variety of ways and on occasion by telephone on occasion in chambers. Sometimes I do it here in open court. That is not a closed proceeding. And that's open to any member of the public at any time.

I don't consider questions from the jury to be something that is handled in secret.

In this particular case, the jury wanted to continue to deliberate. The Court allowed that. The proceedings as far as the—the proceedings in this particular case didn't generate any public interest. I don't recall any anyone in the public being—frankly any attention to this case. Not that that's a determining factor, but this was a misdemeanor jury trial demand, and the Court is not aware of any member of the public desiring any access to the Court for purposes of return of the verdict.

The deliberations obviously must occur out of the presence of the public. The jury deliberations, that part of the trial, is not open to the public regardless of the hours that they occur that they might occur. The return of the verdict in this particular instance did occur after hours with counsel present. Although co-counsel ... apparently unbeknownst to the Court that she represents to the Court that she wanted to come up here. Another member [ (sic) ] the Prosecutor's Office came up, and of course [defense counsel] was here.

I do want it to be clear that the Court hopes it was not closed to the public in the sense that this Court was excluding members of the public. If had we had a group of ten people show up and wanted to observe the taking of the verdict, that would have been no problem as far as the Court is concerned. The person who came from the Prosecutor's Office was not connected to the case. He was here because [the DPA] was here.

In this particular case as far as the record, we do have a record of the proceedings, and that's been preserved by way of videotape such that any member of the public that wanted to observe what the Court did at the time of the taking of the verdict could still actually observe that proceeding.

Since the motion was filed, another court did have a [ (sic) ] deliberations, again at the request of the jury, going past 4:30. And in that particular instance, this Court assisted the other Court in opening the building so that in case any member of the public wanted to come in and observe the proceedings, it could. Although, personally in this instance made a check of the area, and there was just no one around that had any—and [co-counsel] you represent that you were downstairs apparently. Is that what you're telling me?

[CO–COUNSEL]: Your Honor, that's correct. And in fact, your law clerk can verify that because my daughter and I were waiting in P–4 for about 15 minutes, and then the door opened, and [Defendant, defense counsel] and your clerk, who escorted them out of the building, was there. So we had come with the understanding that we would be let in.

THE COURT: We were unaware of the fact that you were trying to get in, and we certainly would have let you in. We were not aware of it. And had we been aware of it—did you see any members of the public that were there to—anywhere around the building that were—seemed to be wanting to come into observe the proceeding?

[CO–COUNSEL]: I came in directly through the parking lot with my daughter, and we went to P–4.

THE COURT: Anyone else present in the area?

[CO–COUNSEL]: Not at P–4, your Honor.

THE COURT: Well, you would have come through P–4, which is the main level.

[CO–COUNSEL]: I didn't come in through the top, but I didn't see anybody, your Honor.

THE COURT: Well, as I say, this case wasn't in the kind of case that would have generated—or it didn't generate any interest. That raises an interesting question in what do you do if the jury wants to remain and the building is secured. So as I say, in this more recent case what was done was to open one of the doors on the first floor so that the building would be open. And maybe that's the procedure we should follow in the future. I don't know.

But I just want to make it crystal clear to the parties that the Court did not consider any portion of the proceedings, with the exception of the jury deliberations, to be closed to the public.

But I understand your concerns, [co-counsel], in the sense that normal security caused the building to be closed. Perhaps, ultimately we should never have a jury deliberate past 4:30. Yet I don't know how jurors would feel about that. But, you know, we ask an awful lot of jurors, so it's a difficult thing.

But in the Court's view, given the particular facts in this case and the particular circumstances, I don't think it—I think it's—from the cases that you cite, I don't think it rises to the level of relief that you've requested. Although I recognize there are serious constitutional issues involved, and I don't take it lightly.

. . . .

And as to the other issues raised as to counts four and five, the Court did issue a unanimity—or instruct the jury with respect to unanimous verdict, 8.02(b) is the pattern instruction. I just wanted to note that for the record.

Having considered all of [ (sic) ] arguments, the Court is of the view that with respect to all issues presented, that leads the Court to the conclusion that the motion should be denied. The motion is at this time denied including the alternative relief.

And [the DPA] is ordered to prepare the appropriate order.

The family court filed a summary denial of Defendant's motion on December 29, 2004.

The family court convicted and sentenced Defendant in counts four and five on December 21, 2004, and judgment was entered that day. Defendant filed his notice of this appeal on February 11, 2005, within the time extended by the family court for the filing of a notice of appeal.

## II.

### A.

For the first of his two points of error on appeal, Defendant contends the family court violated his federal and State constitutional rights to a public trial by allowing the jury to deliberate, communicate and return its verdict after normal business hours, when the courthouse was closed to the public.

Defendant stakes this point pretty much entirely on *State v. Ortiz*, 91 Hawai'i 181, 981 P.2d 1127 (1999), in which the trial court banished the Ortiz 'ohana from the courthouse midway through the evidentiary part of the trial, amidst allegations that at least some of their ilk had threatened a prosecution witness who had already testified. *Id.* at 185–87, 981 P.2d at 1131–33.

In deciding whether the trial court had violated Ortiz's right to a public trial, the supreme court set out the analytical framework for judging courtroom closures:

This jurisdiction has addressed a defendant's right to a public trial as follows:

The Sixth Amendment provides that in all criminal prosecutions, the defendants shall have the right to a speedy and public trial. Article I, Section [14], of the Hawai'i Constitution, which was modeled after the Sixth Amendment to the United States Constitution, *State v. Wong*, 47 Haw. 361, 389 P.2d 439 (1964), contains a similar mandate. "The purpose of the requirement of a public trial was to guarantee that the accused would fairly be dealt with and not unjustly condemned." *Estes v. Texas*, 381 U.S. 532, 538–539, 85 S.Ct. 1628, 14 L.Ed.2d 543 . . . (1965). But so deeply ingrained has been our traditional mistrust for secret trials, *see In re Oliver*, 333 U.S. 257,

68 S.Ct. 499, 92 L.Ed. 682 ... (1948), that the general policy of open trials has become firmly embedded in our system of jurisprudence.

*Gannett Pacific Corp. v. Richardson,* 59 Haw. 224, 228, 580 P.2d 49, 53–54 (1978). Moreover, the United States Supreme Court has observed that, "without exception[,] all courts have held that an accused is[,] at the very least[,] entitled to have his friends, *relatives* and counsel present, no matter with what offense he may be charged." *In re Oliver,* 333 U.S. at 271–72, 68 S.Ct. 499, 92 L.Ed. 682 (emphasis added).

> Nevertheless, the right to a public trial is not absolute.

> "The presumption of openness may be overcome only by an overriding interest based on *findings* that closure is essential to preserve higher values and is *narrowly tailored* to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered."

*Waller v. Georgia,* 467 U.S. 39, 45, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) (quoting *Press–Enterprise Co. v. Superior Court of California,* 464 U.S. 501, 510, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984)) (emphases added). Specifically, the *Waller* court articulated a four-part test that must be applied in order to determine whether a courtroom may be closed over a defendant's objection:

> [ (1) ] the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, [ (2) ] the closure must be no broader than necessary to protect that interest, [ (3) ] the trial court must consider reasonable alternatives to closing the proceeding, and [ (4) ] it must make findings adequate to support the closure.

467 U.S. at 48, 104 S.Ct. 2210, 81 L.Ed.2d 31. In *Waller,* upon the prosecution's motion and over the defendant's objection, the trial court closed a suppression hearing to all persons other than witnesses, court personnel, the parties, and their attorneys. *Id.* at 41–42, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31. The United States Supreme Court, applying the foregoing test, held that the trial court's closure of the courtroom had violated the defendant's right to a public trial. *Id.* at 48, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31.

Although *Waller* addressed the *complete* closure of a trial to the public, federal and state courts have subsequently extended the *Waller* analysis to *partial* closures of trials, *i.e.,* both closure of a segment of the trial during which the testimony of one or more witnesses is elicited and closure limited to particular members of the public. *See English v. Artuz,* 164 F.3d 105 (2d Cir.1998) (courtroom closed to the public during the testimony of one witness); *United States v. Blanche,* 149 F.3d 763 (8th Cir.1998) (defendant's family excluded from courtroom after defense rested); *United States v. Sherlock,* 962 F.2d 1349 (9th Cir.1989) (defendants' families excluded during one witness' [ (sic) ] testimony), *cert. denied,* 506 U.S. 958, 113 S.Ct. 419, 121 L.Ed.2d 342 (1992); *United States ex rel. Morgan v. Lane,* 705 F.Supp. 410 (N.D.Ill.1989) (courtroom closed to the public during the testimony of one or two witnesses), *aff'd,* 897 F.2d 531 (7th Cir. 1990); *Renkel v. State,* 807 P.2d 1087 (Alaska App.1991) (courtroom closed to the public during testimony of minor victims); *People v. Webb,* 267 Ill.App.3d 954, 205 Ill.Dec. 6, 642 N.E.2d 871 (1994) (defendant's grandmother excluded from courtroom for part of venire proceedings), *appeal denied,* 159 Ill.2d 578, 207 Ill.Dec. 523, 647 N.E.2d 1016 (1995); *State v. Schultzen,* 522 N.W.2d 833 (Iowa 1994) (defendant's family placed behind a screen during the testimony of one witness); *Watters v. State,* 328 Md. 38, 612 A.2d 1288 (1992) (defendant's mother and sister prevented from entering courtroom during one morning of trial), *cert. denied,* 507 U.S. 1024, 113 S.Ct. 1832, 123 L.Ed.2d 460 (1993); *Commonwealth v. Martin,* 39 Mass.App. Ct. 44, 653 N.E.2d 603 (general public excluded from courtroom during voir dire hearing and reopened after the testimony of one witness), *review denied,* 421 Mass. 1102, 654 N.E.2d 1202 (1995); *People v. Nieves,* 90 N.Y.2d 426, 660 N.Y.S.2d 858, 683 N.E.2d 764 (1997) (defendant's wife

and children excluded during the testimony of one witness); *Commonwealth v. Penn*, 386 Pa.Super. 133, 562 A.2d 833 (1989) (courtroom closed to the public during testimony of one witness), *cert. denied*, 502 U.S. 816, 112 S.Ct. 69, 116 L.Ed.2d 43 (1991).

*Ortiz*, 91 Hawai'i at 190–91, 981 P.2d at 1136–37 (ellipses, emphases and some brackets in the original; footnote omitted).

Upon this framework, the *Ortiz* court concluded that the trial court's virtually nonexistent justifications for closure were insufficient. *Id.* at 192–93, 981 P.2d at 1138–39. The supreme court vacated and remanded for a new trial without inquiring into specific prejudice, for the denial of a public trial is structural error:

> We emphasize that the doctrine of harmless error has been held to be inapplicable under the circumstances before us. *See English*, 164 F.3d at 108; *Watters*, 612 A.2d at 1293. The United States Supreme Court has noted that a "defendant should not be required to prove specific prejudice in order to obtain relief for a violation of the public-trial guarantee." *Waller*, 467 U.S. at 49, 104 S.Ct. 2210, 81 L.Ed.2d 31. Indeed, the denial of a public trial is considered a "structural defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). As such, any case in which a defendant is denied the right to a public trial is subject to "automatic reversal." *See Neder v. United States*, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35, 67 U.S.L.W. 4404, 4405–06 (1999) (citing *Waller*); *cf. Territory v. Scharsch*, 25 Haw. 429, 433–37 (1920) (new trial granted where all members of the public excluded from the defendant's trial, because "[t]he order of the court ... deprived the accused of a right guaranteed to him by the Federal Constitution[,] and the exception thereto must be sustained"). Accordingly, Ortiz's conviction must be vacated and the matter remanded for a new trial.

*Ortiz*, 91 Hawai'i at 193, 981 P.2d at 1139 (ellipsis and brackets in the original).

On the strength of *Ortiz*, Defendant contends "there is no question that Mr. Swanson was denied his right to a public trial where the circuit court allowed the jury to deliberate, read and answered jury communications and received the jury's verdict after normal business hours when the court building was closed to the public." Opening Brief at 22. Accordingly, Defendant avers that "per *Ortiz*, there is no necessity to conduct a harmless error inquiry-reversal in this case is mandated and automatic. Accordingly, Mr. Swanson's convictions must be vacated and his case remanded for a new trial on Counts 4 and 5." Opening Brief at 23.

We disagree. We first note that the *Ortiz* court implied a no-man's-land between the territory of the constitutional public trial and the jury trial as a whole, the former apparently remaining a province of the latter:

> Although *Waller* addressed the *complete* closure of a trial [ (sic) ] to the public, federal and state courts have subsequently extended the *Waller* analysis to *partial* closures of trials, *i.e.*, both *closure of a segment of the trial during which the testimony of one or more witnesses is elicited* and closure limited to particular members of the public.

*Ortiz*, 91 Hawai'i at 190–91, 981 P.2d at 1136–37 (underlining emphasis supplied; footnote omitted). We also have the comment of the *Waller* Court, now dated but still telling: "This Court has not recently considered the extent of the accused's right under the Sixth Amendment to insist upon a public trial, and has never considered the extent to which that right extends beyond the actual proof at trial." *Waller*, 467 U.S. at 44, 104 S.Ct. 2210 (ultimately deciding that it extends to evidentiary suppression hearings).

■ It thus behooves us to be exact about when the closure in this case implicated Defendant's right to a public trial, Defendant's averments notwithstanding. It certainly did not during jury deliberations, which are so sacrosanct that not even the trial judge may invade them. *State v. Estrada*, 69 Haw. 204, 228, 738 P.2d 812, 828 (1987) ("we admonish all trial judges not to invade the jury room during deliberations" (citation omitted)).

■ Nor do we think it did during discussions of the family court's responses to jury communications. Such responses are "the functional equivalent of an instruction[,]" *State v. Gonsalves,* 108 Hawai'i 289, 293, 119 P.3d 597, 601 (2005) (citation and internal quotation marks omitted), and if a defendant has no right to be present during the settlement of jury instructions, *State v. Samuel,* 74 Haw. 141, 155, 838 P.2d 1374, 1381 (1992) ("a defendant does not have a constitutional or statutory right to attend a conference determining the legal instructions with which the trial court will charge the jury"), we cannot see how any right of Defendant's was derogated when the settlement of responses to jury communications, albeit not public, was held in court and on the record with Defendant and counsel present.

■ Hence—and to be clear—here, the only material closure came when the jury returned to court and proffered its verdict. *See Wilson v. State,* 148 Md.App. 601, 814 A.2d 1, 15 (Ct.Spec.App.2002) ("the rendering of the verdict is clearly a part of the proceedings and should be open to the public"). Whether this and this alone was *Ortiz* error, as Defendant's point boils down, is the pertinent question.

In this regard, we are mindful, foremost, of the rationale of the *Waller* Court which, in turn, formed the font of the *Ortiz* opinion:

> The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions. In addition to ensuring that judge and prosecutor carry out their duties responsibly, a public trial encourages witnesses to come forward and discourages perjury.

*Waller,* 467 U.S. at 46, 104 S.Ct. 2210 (footnote, citations, internal quotation marks and block quote format omitted). In other words, the *Waller* Court noted,

> Essentially, the public-trial guarantee embodies a view of human nature, true as a general rule, that judges, lawyers, witnesses, and jurors will perform their respective functions more responsibly in an open court than in secret proceedings[.] The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power.

*Waller,* 467 U.S. at 46 n. 4, 104 S.Ct. 2210 (citations, parentheses and internal quotation marks omitted).

We do not feel the weighty force of the foregoing here,[6] where closure was at best inadvertent and at worst unwitting and no objection to the closure was made; Defendant and counsel were present in court and the proceedings on the record; no witness, evidence, examination or argument was presented; and all that was involved was the return of the verdict—and that by a jury informed by the judge in open court before its deliberations, and thus mindful during its deliberations, that its verdict would be received in court.

We are apparently not alone in being unmoved by this situation, which is uncannily similar to that confronted by our company, the Tenth Circuit:

> After normal working hours, the federal courthouse in Santa Fe, New Mexico is closed to the public. Consistent with normal practice, this occurred at 4:30 p.m. during the second day of Mr. Al–Smadi's five-day trial for wire fraud. The court security officers failed to keep the front doors of the courthouse open past 4:30 p.m., given that a trial was in progress. Defense counsel's wife and child were unable to gain access to the second-floor courtroom when they attempted to enter the courthouse after 4:30 p.m. At 4:50 p.m., the trial adjourned. Mr. Al–Smadi appeals

---

**6.** *See United States v. Ivester,* 316 F.3d 955, 960 (9th Cir.2003):

> To determine whether a closure was too trivial to implicate the Sixth Amendment guarantee, we must determine whether the closure involved the values that the right to a public trial serves. These values have been articulat-

ed ... as: (1) to ensure a fair trial, (2) to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions, (3) to encourage witnesses to come forward; and (4) to discourage perjury.

(Citations and block quote format omitted.)

the district court's denial of his motion for a mistrial on the grounds that the closing of the courthouse denied him his Sixth Amendment right to a public trial....

. . . .

The denial of a defendant's Sixth Amendment right to a public trial requires some affirmative act by the trial court meant to exclude persons from the courtroom. The brief and inadvertent closing of the courthouse and hence the courtroom, unnoticed by any of the trial participants, did not violate the Sixth Amendment. Although Mr. Al–Smadi notes that "[t]he trial judge was silent as to what steps, if any, are taken by his chambers to assure that the building remains open when criminal trials go beyond ... 4:30 p.m.," nothing indicates that the situation recurred and we are confident that appropriate steps will be taken to avoid it.

*United States v. Al–Smadi*, 15 F.3d 153, 154–55 (10th Cir.1994) (citations omitted). Although we do not necessarily agree with the rationale of the Tenth Circuit,[7] or that it should be so single, we do concur with the result and the implicit warning the Tenth Circuit gave the trial courts.

We conclude, finally, that Defendant's constitutional rights to a public trial were not implicated when the jury returned its verdict after normal business hours, when the courthouse was closed to the public, because the closure "was too trivial to implicate the [constitutional] guarantee[s.]" *United States v. Ivester*, 316 F.3d 955, 960 (9th Cir.2003).[8] We are loath to deploy the *Waller/Ortiz* "au-tomatic reversal" artillery where the profound policies to be protected did not need protection. We do not believe the right to a public trial is a trivial thing, far from it, but we cry wolf only when we see one.

### B.

Defendant's other point of error on appeal essentially disposes of itself. Defendant contends his federal and State constitutional rights to a fair and impartial trial were violated when the family court admitted into evidence Exhibit 5, the audiotape recording Captain Ribao made of the messages Defendant left on the CW's cell phone. Specifically, Defendant complains that there were in fact six messages contained in Exhibit 5, contrary to the testimonies of the CW and Captain Ribao, and to the DPA's argument to the jury that there were only five messages received and recorded corresponding to counts two through six of the amended complaint.

Defendant claims the jury could have confused the sixth message, which was a duplicate of the fourth, for an entirely different and separate voice mail message. Thus, Defendant cites *State v. Joseph*, 77 Hawai'i 235, 238, 883 P.2d 657, 660 (App.1994) (in a drug case, cut straw unknown to the parties found by the jury in a wallet in evidence was "an outside influence that could substantially prejudice the defendant's right to a fair and impartial jury"), and thereupon argues that the sixth message was an improper and prejudicial outside influence on the jury. In support of his claim of prejudice, Defendant

---

7. We do observe, however, that the analytical framework laid out in *Waller v. Georgia*, 467 U.S. 39, 48, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), required to be expressly addressed before a trial court can close its courtroom to the public, *State v. Ortiz*, 91 Hawai'i 181, 191, 981 P.2d 1127, 1137 (1999), cannot be prospectively addressed where, as here, the closure was inadvertent or unwitting and neither party timely objected. Obviously, absent "some affirmative act by the trial court meant to exclude persons from the courtroom[,]" *United States v. Al–Smadi*, 15 F.3d 153, 154 (10th Cir.1994), or at least a timely objection, *Waller* and *Ortiz* cannot be solely controlling in our situation.

8. *Cf. Wilson v. State*, 148 Md.App. 601, 814 A.2d 1, 15–16 (Ct.Spec.App.2002), in which the appeals court rejected Wilson's claim of a violation of his right to a public trial, apparently on the basis that there was in fact no closure of the courtroom during the return of the jury's verdict, but then went on to address the policies underlying the right:

> Although the rendering of the verdict is clearly a part of the proceedings and should be open to the public as should be every other phase of the proceedings, contrary to the doubts expressed by the prosecutor, notably, appellants' complaints are directed at only a very limited period of time—the rendering of the verdict. The circumstances of the case at bar present neither the vagaries of the Star Chamber or secret tribunal atmosphere. Nor were the judge, prosecutor, and witnesses shielded from the illuminating glare of public scrutiny as they performed their respective duties. The guarantees of an open and public trial were not violated in the proceedings below.

cites the inconsistent testimonies and argument mentioned above, as well as the jury communications seeking congruence between the dates of the calls and the charges in the amended complaint, as evidence that the jury was hopelessly confused to Defendant's detriment by the presence of the sixth message. Indeed, Defendant avers, "there was no way of conclusively ascertaining that the jury did not rely on the same message to convict Mr. Swanson on two separate counts." Opening Brief at 28.

This point is devoid of merit. We have listened many times, and very carefully, to Exhibit 5, and there is simply no way anyone, much less a jury of twelve, could mistake the sixth message for anything other than an exact duplicate of the fourth, which was indubitably in evidence. This being so, Defendant's arguments on this point fall for lack of a sound factual foundation.

### C.

Accordingly, the December 21, 2004 judgment of the family court is affirmed.

