UNITED STATES, Appellee

v.

Daniel ORTIZ, Private First Class
U.S. Army, Appellant

No. 07-0555

Crim. App. No. 20040672

United States Court of Appeals for the Armed Forces

Argued February 6, 2008

Decided May 30, 2008

RYAN, J., delivered the opinion of the Court, in which
EFFRON, C.J., and BAKER and ERDMANN, JJ., joined. STUCKY,
J., filed a separate dissenting opinion.


Counsel

For Appellant: William E. Cassara Esq. (argued); Captain
Alison L. Gregoire (on brief); Major Tyesha E. Lowery.

For Appellee: Captain Trevor A. Nelson (argued); Colonel
John W. Miller II, Major Elizabeth G. Marotta, and Captain
Larry W. Downend (on brief).

Military Judge: Lauren B. Leeker

THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.

United States v. Ortiz, No. 07-0555/AR

Judge RYAN delivered the opinion of the Court.

A general court-martial, composed of military judge alone, convicted Appellant, contrary to his pleas, of rape of a child under sixteen, sodomy of a child under sixteen, two specifications of indecent liberties, indecent acts, and wrongful communication of a threat, in violation of Articles 120, 125, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 920, 925, 934 (2000). The sentence adjudged by the court-martial and approved by the convening authority included a dishonorable discharge, reduction to the lowest enlisted grade, forfeiture of all pay and allowances, and confinement for twenty-five years. The United States Army Court of Criminal Appeals summarily affirmed the findings and sentence. United States v. Ortiz, No. ARMY 20040672 (A. Ct. Crim. App. Mar. 23, 2007) (unpublished). On Appellant's petition, we granted review.[1]

---

[1] We granted review of:

WHETHER APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO A PUBLIC TRIAL WHEN THE MILITARY JUDGE EXCLUDED THE PUBLIC FROM THE COURTROOM WHEN THE VICTIM, BP, TESTIFIED ON THE MERITS.

65 M.J. 335 (C.A.A.F. 2007).

## I.  Facts

Appellant was accused of raping, sodomizing, and subsequently threatening the daughter of a family friend and neighbor.  The victim, BP, was nine years old when the crimes were committed.  At the time of trial she was eleven.

BP was the first witness called by the Government at trial.  It is apparent from the record that she had considerable difficulty testifying.  Despite efforts by the trial counsel, whom the military judge gave leave to ask leading questions, BP's answers were largely unresponsive and inaudible.

The military judge allowed BP to take a break in order to "get her composure."  During the break, the military judge conducted a brief Rule for Courts-Martial (R.C.M.) 802 session.  The parties agreed that BP's Victim Witness Advocate would move from the gallery, where she had been sitting at the outset of BP's testimony, to the panel box, so that BP could see her more easily and answer questions more directly.  BP continued to be unresponsive.

Trial counsel then moved to admit as exhibits two anatomically correct dolls to assist in BP's testimony. Defense counsel lodged an objection, at which time BP told defense counsel to "shut up."  The military judge

instructed her to treat everyone in the courtroom with respect.

At this point, trial counsel moved to clear the gallery:

TC:  Your honor, at this time the government would move the court to clear the gallery of spectators.  The reason for that is that it's apparent from [BP's] testimony that she's having difficulty testifying.  I believe that's resulting from some embarrassment.  And we would ask that the court exclude the members of the gallery from the gallery of the courtroom.

MJ:  What's your authority?

TC:  In the Manual for Courts-Martial 2002 Edition, in the discussion section under Rule 806 where it discusses the Rule for 806 about a public trial, it says that "occasionally defense and prosecution may agree and request a closed session to enable a witness to testify without fear of intimidation or acute embarrassment or will testify about a matter, which while not classified as of a sensitive or private nature and that closure may be appropriate in such cases."

.  .  .  .

MJ:  Does defense have an objection to clearing the gallery for [BP's] testimony?

.  .  .  .

DC:  Judge, we would note our objection to excluding the people from the gallery. Number one, it's a public trial.  Number two, as I read the paragraph that the court invited to my attention, it says, "occasionally defense and prosecution may agree to request a closed session to enable

4

a witness to testify without fear of intimidation or acute embarrassment, etc." I don't know that there's been any intimidation, that's for sure. Secondly, judge, as far as the gallery is concerned, the young lady had had her back to the gallery because of the positioning of the microphone. She's primarily --

MJ: Well, I agree, but -- but I think when they're -- I think the intent there is if they are here and can hear, that it would be -- that it is -- (pause) -- that it would be difficult.

TC: Your honor, the government also wants to ask -- it's not only that intimidation or embarrassment. It also goes on to say in the discussion "if the matters are of a sensitive or a private nature" and the government has good faith belief to believe that [BP] could testify to matters that are of a sensitive and private matter to her.[2]

_____

[2] This discussion highlights the trial counsel and military judge's apparent misunderstanding of the treatment by the 2002 Manual for Courts-Martial, United States (2002 ed.) of the public trial right in R.C.M. 806, which provided in pertinent part: "Except as otherwise provided in this rule, courts-martial shall be open to the public." (emphasis added). Further, "a session may be closed over the objection of the accused only when expressly authorized by another provision of this Manual." R.C.M. 806(b) (emphasis added). The defense did object, and none of the provisions that expressly authorized closure, Military Rule of Evidence (M.R.E.) 412(c) (addressing victim's sexual predisposition), M.R.E. 505(i) and (j) (addressing classified information), and M.R.E. 506(i) (addressing non-classified but sensitive government information), pertained. R.C.M. 806(b) Discussion. Thus, while the Discussion does recognize that "the defense and prosecution may agree to request a closed session to enable a witness to testify without fear of intimidation or acute embarrassment, or to testify about a matter which, while not classified, is of a sensitive or private nature," id., the defense counsel objected to the closure in this case. Because the construction and application of R.C.M. 806 was

5

In response to the motion and argument, the military judge stated that "the question seems to be . . . whether or not she's going to be capable of doing it -- whether she would be more capable of doing it or more able to do it if the gallery were briefly excluded."  The military judge then recessed the court for approximately ten minutes in order to research and consider the motion.

Upon calling the court to order, the military judge ordered a chair be placed in the well of the court, directly in front of her bench, and proceeded to question BP.

    MJ:    Okay.  Now you've said before you're 11?

    WIT:   Yes.

    MJ:    Okay, good.  You're going to become a
           professional at this before too long.  (Pause.)
           Are you nervous?

    WIT:   Yes.

    MJ:    Why are you nervous?

    WIT:   Because.

    MJ:    Is this hard?

    WIT:   Yes.

---

not briefed by the parties and is not necessary to the disposition of the granted issues, we need not and do not decide whether failure to comply with the 2002 version of R.C.M. 806 alone would be tested for prejudice, or deemed structural error.

MJ:   Why is it hard?

WIT:  Because somebody's in here.

MJ:   Because people are here?

WIT:  No, because -- yes, and to somebody.

MJ:   Because somebody is here.

WIT:  Yes, and because people are here.

MJ:   Okay.

          . . . .

MJ:   Okay, you said it was hard because there are
      people here?

WIT:  (Affirmative nod.)

MJ:   When you get nervous, do you tend to talk real
      low like you're doing now?

WIT:  I guess.

MJ:   Well, I'm just thinking that if you're a
      cheerleader you have to be able to yell and
      scream, right?

WIT:  Yes.

MJ:   Okay.  So are you talking real low and
      scrunching down in your seat because this is a
      hard thing to talk about?

WIT:  Yes.

MJ:   And because there are a lot of adults here and
      you're the only kid?

WIT:  No.

MJ:   No?

Wit:  No.

MJ:    Are you upset to be here today?

WIT:   No.

MJ:    You're not upset to be here?

WIT:   (Negative head shake.)

MJ:    Okay. Even though your chair is faced towards me, do you know -- are you aware -- is it problematic that there are people in the -- back in the gallery?

WIT:   What do you mean?

MJ:    (Pause.)  Is it difficult to come in and talk to all of us today?

WIT:   Yes.

MJ:    (Pause.)  And sometimes it's kind of hard because even though you -- you're not looking at people, you know that they're there watching you.

WIT:   Yes.

MJ:    (Pause.)  [BP], what's happening here today is real serious.  Have they talked to you about that?

WIT:   Uh-huh.  What people talked?

MJ:    Well, have -- when you were interviewed by the counselors in this case, did they talk to you about the fact this is important?

WIT:   Yes.

MJ:    Okay.  And I know it's hard.  It's particularly hard when you're only 11 years old.  Would it be a little easier if there weren't quite so many people here?

WIT:   Kind of.

MJ:    Do you think that you would be able to answer

> the questions if there weren't quite so many people here?

WIT:    Yes.

MJ:    You think you could?

WIT:    (Affirmative nod.)

MJ:    You're nodding your head.  Is that a yes?

WIT:    Yes.

Following this colloquy, and without further discussion or explanation, the military judge ordered the courtroom cleared of spectators and the doors locked.  The record does not reflect how many spectators were in attendance, or whether any of them were or were not friends or family of Appellant.

After the courtroom was cleared trial counsel recommended direct examination of BP and elicited testimony that Appellant raped, sodomized, and threatened her.  BP's testimony, and the court closure, lasted the majority of the first day of a two-day trial.  The remaining Government witnesses, excluding one witness whose testimony was ultimately disallowed by the military judge, testified for a total period of approximately two hours, during which time the courtroom was open to the public.

## II.  Analysis

"In all criminal prosecutions, the accused shall enjoy the right to . . . a public trial."  U.S. Const. amend. VI. A public trial "ensur[es] that judge and prosecutor carry out their duties responsibly . . . and discourages perjury."  Waller v. Georgia, 467 U.S. 39, 46 (1984).

Yet, as interpreted by the Supreme Court, the right to a public trial is not absolute.  Id. at 45 (stating that the "Court has made clear that the right to an open trial may give way in certain cases to other rights or interests"); see also United States v. Hershey, 20 M.J. 433, 436 (C.M.A. 1985) (stating the same).  However, there is a strong presumption in favor of a public trial, grounded in the belief that it is critical to affording an accused a fair trial, as "'judges, lawyers, witnesses, and jurors will perform their respective functions more responsibly in an open court than in secret proceedings.'" Waller, 467 U.S. at 46 n.4 (quoting Estes v. Texas, 381 U.S. 532, 588 (1965) (Harlan, J., concurring)).  This presumption is overcome only where "the balance of interests . . . [is] struck with special care."  Id. at 45. In striking this balance, the Supreme Court has looked to its First Amendment jurisprudence regarding the press and public's right to attend criminal trials and incorporated

10

the test used there in the Sixth Amendment context.  Id. at

45-46.

Recognizing the importance of the right, not only to

an accused, but to the public and the integrity of the

criminal process, prior to closing a trial we require that:

> [(1)] the party seeking closure must advance an
> overriding interest that is likely to be
> prejudiced; [(2)] the closure must be narrowly
> tailored to protect that interest; [(3)] the
> trial court must consider reasonable alternatives
> to closure; and [(4) the trial court] must make
> adequate findings supporting the closure to aid
> in review.

Hershey, 20 M.J. at 436 (citing Press-Enterprise Co. v.

Superior Court (Press-Enterprise I), 464 U.S. 501 (1984);

and Waller, 467 U.S. at 46).

The question before us is whether the military judge

abused her discretion in closing the courtroom during BP's

testimony.  See United States v. Short, 41 M.J. 42, 44

(C.M.A. 1994) (reviewing a ruling under R.C.M. 806(b) for

an abuse of discretion); United States v. Travers, 25 M.J.

61, 62 (C.M.A. 1987) (applying an abuse of discretion

standard and stating that "[t]he question of whether 'an

overriding interest' [necessitating closure] exists lies in

the sound discretion of the military judge"); United States

v. Farmer, 32 F.3d 369, 371-72 (8th Cir. 1994) (reviewing a

decision to temporarily close a trial for an abuse of

11

discretion).  "A military judge abuses his discretion when
. . . [she] improperly applies the law."  United States v.
Roberts, 59 M.J. 323, 326 (C.A.A.F. 2004).  Here, the only
question is whether the military judge correctly applied
the law.  The military judge in this case failed to
correctly apply the legal test necessary to overcome the
presumption in favor of a public trial.  Consequently, the
denial of the right to a public trial was an abuse of
discretion.

The military judge did not even identify the relevant
factors to consider or articulate the reason for her
decision to clear the courtroom, let alone make findings.
For that reason alone her decision was not in conformity
with the law.  See Waller, 467 U.S. at 45 (stating that a
trial judge must make "'findings specific enough that a
reviewing court can determine whether the closure order was
properly entered'" (quoting Press-Enterprise I, 464 U.S. at
510)).  On the other hand, the record illustrates both a
practical reason for closure -- the child witness could not
or would not testify before the courtroom was closed -- and
that at least some alternatives less restrictive than
closure were attempted.

The real question, therefore, is whether failure to
meet the test articulated by the Supreme Court in Waller

makes the deprivation of the Sixth Amendment right to a public trial erroneous. On the bare record before us, we hold that it does.

This is an unfortunate case. The articulated interest proposed by the Government counsel was ambiguous, at best. And the military judge failed to make any findings, let alone adequate findings, supporting closure to aid in review. It is unfortunate because, based on the record before us, the military judge could well have made findings supporting her decision, and in the process perhaps better articulated the Government's interest in the closure. With this lacuna, we need not address the question whether the closure was narrowly tailored to protect the overriding interest or whether reasonable alternatives to closure were considered, since the military judge did not inform us of the basis for her decision.

A. The Articulation of an Overriding Interest

In order to overcome the strong presumption in favor of the public trial right, the party seeking closure must articulate and advance an overriding interest that is likely to be prejudiced. No one questions that if trial counsel had articulated that closure was necessary to protect the physical and psychological welfare of BP, the minor victim, an overriding interest would have been

advanced.  See Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 607 (1982) (stating that "safeguarding the physical and psychological well-being of a minor -- is a compelling" interest) (footnote omitted); United States v. Galloway, 937 F.2d 542, 546 (10th Cir. 1991) (finding a "substantial or compelling interest in protecting young witnesses who are called to testify in cases involving allegations of sexual abuse").  But that was not the interest advanced in this case.

Rather, the trial counsel specifically requested closure on the grounds that BP was having trouble testifying, possibly because she was embarrassed, and a general observation that the testimony was of "a sensitive or private nature."  Suggesting that a witness's difficulty testifying based on possible embarrassment, or the private or sensitive nature of the testimony alone is sufficient to constitute the "compelling interest" that is "likely to be prejudiced" necessary to override an accused's right to a public trial is inarticulate at best.[3]  See Hershey, 20 M.J. at 436 (stating that "[w]hile it may be permissible under certain circumstances to exclude spectators during the

---

[3] We save for another day the question whether the Government's anemic articulation of an overriding interest could have been resurrected by more specific findings on the part of the military judge.

testimony of a victim of tender years, that must be decided on a case-by-case basis and not based on the mere utterance of the word 'embarrassment'").

Not only are we aware of no case where such a proffer was deemed sufficient, it seems contrary to the Supreme Court's analysis in Globe Newspaper, which appeared to reject generalized assertions of closure based on the possibility of embarrassment or the sensitive nature of the testimony.  See 457 U.S. at 606-09.

B.  Adequate Findings on the Record

Even assuming the trial counsel's asserted interest was sufficient as articulated, Hershey requires the military judge to consider the interest, make a determination on a case-by-case basis, and make adequate findings to support appellate review.  20 M.J. at 436.

In making that determination, a military judge's findings should show that she considered factors such as "the minor victim's age, psychological maturity and understanding, the nature of the crime, the desires of the victim, and the interests of parents and relatives."  Globe Newspaper, 457 U.S. at 608 (footnote omitted).  In this case, the military judge asked BP several leading questions regarding her age, whether she had discussed the necessity of her testimony with counselors, the reasons for her

difficulties testifying, and finally asked her if closing the courtroom would mitigate those difficulties.

The answers elicited in response to these questions may have formed the basis for a determination that closure was necessitated in this case to protect the well-being of a minor victim, and adequate findings for appellate review. But the military judge never affirmatively, either orally or in a written addendum to the record, articulated findings as to why she deemed closure to be necessary; she simply ordered the courtroom closed. While we do not believe the Sixth Amendment dictates a formalistic approach as to the manner in which a military judge delivers her findings, this Court, following the lead of the United States Supreme Court, requires that a military judge make some findings from which an appellate court can assess whether the decision to close the courtroom was within the military judge's discretion. Press-Enterprise Co. v. Superior Court (Press-Enterprise II), 478 U.S. 1, 13-14 (1986); Waller, 467 U.S. at 47; Press-Enterprise I, 464 U.S. at 510; Hershey, 20 M.J. at 436.

On the current state of the record we have no way of knowing the military judge's reasons or reasoning for closing the courtroom. This makes it impossible to determine whether the military judge properly balanced the

16

inadequate interest asserted by the Government -- possible embarrassment to BP -- against the accused's right to public trial, or substituted another interest such as the psychological well-being of the child in place of the one inartfully asserted by the Government.  See Press-Enterprise II, 478 U.S. at 13-14 ("[P]roceedings cannot be closed unless specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest.") (citations and quotation marks omitted); Waller, 467 U.S. at 49 n.8 (rejecting appellate court's post hoc assertion that the trial court properly balanced the interests where findings were inadequate); English v. Artuz, 164 F.3d 105, 109-10 (2d Cir. 1998) (holding that the absence of "meaningful findings" violated the appellant's right to a public trial); Guzman v. Scully, 80 F.3d 772, 776 (2d Cir. 1996) (stating the same).

    C.  Erroneous Deprivation of the Right to Public Trial

    The Government argues that none of the above constitutes an erroneous deprivation of Appellant's Sixth Amendment right to a public trial either because it was not a true closure or because this Court can, post hoc, discern sufficient information from the record to perform the test laid out in Waller and Hershey on our own.  We disagree.

17

1.  Appellant's Trial Was Completely Closed

Where some spectators are required to leave, and some spectators can or do remain, the Constitution's public trial guarantee, which ensures that participants perform their duties "more responsibly" and discourages perjury, see Waller, 467 U.S. at 46 & n.4 (citation and quotation marks omitted), is "only moderately burdened . . . as certain spectators remain and are able to subject the proceedings to some degree of public scrutiny." Judd v. Haley, 250 F.3d 1308, 1315 (11th Cir. 2001). A partial closure that allows some, but not all, spectators to remain thus may not raise precisely the same concerns articulated in Waller and Press-Enterprise I. See, e.g., Garcia v. Bertsch, 470 F.3d 748, 753 (8th Cir. 2006) (allowing a laxer standard "because a partial closure does not 'implicate the same secrecy and fairness concerns that a total closure does'" (quoting Farmer, 32 F.3d at 371)); Nieto v. Sullivan, 879 F.2d 743, 753 (10th Cir. 1989) (using "a less stringent test of a 'substantial reason' where partial closures are held necessary"); Douglas v. Wainwright, 714 F.2d 1532, 1540 (11th Cir. 1983) (holding that "where neither all members of the public nor the press are excluded, the 'public' nature of the proceedings may be retained sufficiently so that a lesser justification for

the partial closure will suffice to avoid constitutional deprivation").

Consequently, several circuits have found no erroneous deprivation of the right to a public trial despite limited findings or the absence of findings in the context of a "partial closure." See, e.g., United States v. Sherlock, 962 F.2d 1349, 1356-57 (9th Cir. 1992) (holding that limited findings were acceptable in a partial closure case). The parties have cited no case where a more lax approach to the absence of findings was adopted after the court found a complete, albeit temporary, closure of the courtroom.[4]

Labeling a closure as "complete" or "partial" is a qualitative, not temporal, question. While the Government

---

[4] We note that one circuit has, in the course of considering a habeas corpus petition based on an allegation of ineffective assistance of counsel in a state trial, determined that it was not an unreasonable application of federal law to find no ineffective assistance of counsel for failing to raise a erroneous deprivation of the right to a public trial on direct review where specific findings were not made by the judge, but the record did not show that the judge had not made a considered determination to close the court. Bell v. Jarvis, 236 F.3d 149, 171-72 (4th Cir. 2000) (stating "[w]e find no basis upon which to conclude that the trial judge failed to carefully consider the individual facts of this case before making his decision, or that he otherwise shirked his duty in this regard"). Given the standard of review applied in collateral challenges to state court decisions, we think it is not persuasive authority for a case on direct review.

argues that the closure in this case was partial because it did not encompass the entirety of the proceedings, we think the appropriate analysis begins by asking exactly who was barred from the court.  Closures have typically been described as "partial" when select spectators or members of the press were barred from the courtroom, but others were allowed to remain.  See, e.g., United States v. Osborne, 68 F.3d 94, 99 (5th Cir. 1995) (exclusion of codefendant's sister and "new spectators" during testimony of one witness upheld); Farmer, 32 F.3d at 371-72 (exclusion of all spectators except victim's family while victim testified upheld); Kuhlmann, 977 F.2d at 76-78 (exclusion of defendant's common law wife, his common law wife's sister and his cousin during one witness's testimony upheld); Nieto, 879 F.2d at 753-74 (exclusion of defendant's sisters and other unspecified relatives during one witness's testimony upheld); Sherlock, 962 F.2d at 1356-59 (exclusion of defendants' unspecified family members during victim's testimony upheld).  Conversely, the temporary nature of a closure has not prevented courts from describing it as "complete."  English, 164 F.3d at 110 (complete closure to seal the court during one witness's testimony).  In this case, the courtroom was cleared of all spectators during the vast majority of BP's testimony.

20

Going beyond the question of who was barred, the United States Court of Appeals for the Second Circuit succinctly articulated other substantive factors to be considered in determining whether a closure is "broad or narrow," "complete or partial":

> [It] depends on a number of factors, including its duration, whether the public can learn (through transcripts, for example) what transpired while the trial was closed, whether the evidence presented during the courtroom closure was essential, or whether it was merely cumulative or ancillary, and whether selected members of the public were barred from the courtroom, or whether all spectators were precluded from observing the proceedings.

Bowden v. Keane, 237 F.3d 125, 129-30 (2d Cir. 2001) (citations omitted).

In this case the court was closed to the public during the substantive testimony of the key Government witness, which was essential to, and comprised the bulk of, the Government's case. All spectators were barred from observing the crux of the proceedings against Appellant.

It is true that this Court described a closure during the testimony of the key government witness as partial after considering the short duration of the closure, but notable to the decision in that case was that, "[m]ore importantly, it appears that the only person present in the courtroom other than the accused and court personnel when

21

trial counsel made his exclusionary motion was appellant's escort.  The two people asked to leave the courtroom, then, were not there as spectators, but to perform a governmental function."  Hershey, 20 M.J. at 437.

In this case, the record indicates that the courtroom was completely closed to spectators.  The military judge "cleared the gallery," creating a strong inference there were spectators to clear, and locked the doors during the entirety of the substantive testimony of the Government's critical witness -- the victim.  Nothing in the record indicates whether the friends or family of the accused or the witness were present.  See In re Oliver, 333 U.S. 257, 272 (1948) (noting that "an accused is at the very least entitled to have his friends, relatives and counsel present").  And while the military judge did suggest she might reopen the courtroom during BP's testimony, United States v. Ortiz, __ M.J. __ (6) (C.A.A.F. 2008) (Stucky, J., dissenting), that never occurred.  The closure in this case was a complete closure for purposes of the Sixth Amendment, albeit less than complete in a temporal sense.

2.  This Court May Not Make Post Hoc Findings

The Government asks us to infer and glean from the record findings that were not placed there by the military judge.  We decline to engage in post hoc reconstruction of

22

facts and findings that could have been made at trial, but were not. The trial procedure to address this Sixth Amendment right requires, inter alia, trial counsel to advance a compelling interest and the military judge to carefully balance, on the record, that interest against the accused's Sixth Amendment right. The military judge was required to place her analysis on the record sufficient to demonstrate that this balancing occurred. That did not happen.

Moreover, the Government's assertion misapprehends the test articulated by the Supreme Court. Waller, 467 U.S. at 49 n.8 (rejecting the Georgia Supreme Court's post hoc balancing analysis as unable to satisfy the Press-Enterprise I standard).[5] The question is not whether an appellate court can supply a cogent reason why it was acceptable to deprive an accused of the constitutional right to a public trial. Rather, the question is whether the military judge identified the competing interests and balanced them in a given case. The mind of the military

---

[5] The dissent appears to embrace the Government's suggestion that this Court can fill the void in the record via post hoc rationalization that the military judge did engage in the required balancing test. However, there is simply no statement by the military judge identifying or suggesting she balanced the factors outlined in Waller and Hershey, and that "assertion finds little or no support in the record." Waller, 467 U.S. at 49 n.8.

judge cannot be inferred from the record, absent something in the record reflecting the military judge's analysis.

Finally, under the circumstances of this case, Appellee's argument ignores that this Court may only take action with respect to matters of law. Article 67(c), UCMJ, 10 U.S.C. § 867(c) (2000). Therefore, we reject the Government's request that we selectively search the record and make factual findings supporting the military judge's decision to close the courtroom.

### D. Remedy

In this case, the record does not support a conclusion that the Waller/Hershey balance was considered or struck by the military judge. Consequently, the presumption in favor of the right to a public trial was not overcome at trial, and the complete deprivation of the right was erroneous.

An erroneous deprivation of the right to a public trial is structural error, which requires this Court to overturn Appellant's conviction without a harmlessness analysis. Arizona v. Fulminante, 499 U.S. 279, 310 (1991) (noting that denial of the right to public trial is a structural error because it is a "constitutional deprivation[] . . . affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself" (citing Waller, 467 U.S. at 49 n.9)).

### III.  Decision

The decision of the United States Army Court of Criminal Appeals is reversed.  The findings and sentence are set aside, and the record of trial is returned to the Judge Advocate General of the Army.  A rehearing is authorized.

United States v. Ortiz, No. 07-0555/AR

STUCKY, Judge (dissenting):

The majority is correct; this is an unfortunate case. But while the military judge may not have followed best practice by failing to articulate specific findings of fact, I cannot find that she misapplied the Supreme Court's test in Press-Enterprise Co. v. Superior Court (Press-Enterprise I), 464 U.S. 501 (1984). Because a proper foundation for closing the courtroom during part of BP's testimony is evident from the record, I would find no abuse of discretion and, therefore, no deprivation of the Sixth Amendment right to a public trial. As such, I dissent.

I find the majority's analysis unpersuasive for two related reasons. First, I do not understand the plain language of either Press-Enterprise I, or United States v. Hershey, 20 M.J. 433 (C.M.A. 1985), to require the military judge to "affirmatively . . . articulate[] findings" on the record. United States v. Ortiz, __ M.J. __ (16) (C.A.A.F. 2008). In Press-Enterprise I, the Supreme Court simply required "findings specific enough that a reviewing court can determine whether the closure order was properly entered," 464 U.S. at 510, much like any reviewing court requires a record adequate for review. See, e.g., Bradshaw v. Stumpf, 545 U.S. 175, 183 (2005) (citing Boykin v. Alabama, 395 U.S. 238, 244 (1969)). To demand anything more transforms what was intended as a flexible

approach into a formalistic one, regardless of the majority's suggestion to the contrary.

Second, though I remain doubtful that this was a complete closure, even the assumption that it was does not support the majority's view that making explicit findings on the record is a prerequisite to upholding the closure in this case. While the majority might not have found any complete closure case in which a federal court adopted a nonformulaic approach to findings, that is so because the adequacy of findings was not at issue in most cases. After all, most judges simply make explicit findings. The majority cites no case that actually holds that completeness of the closure is the fulcrum upon which the findings prong sits.

Instead, it cites cases concerning the relaxation of the first prong of the Press-Enterprise I test in partial closure cases. In Bell v. Jarvis, 236 F.3d 149 (4th Cir. 2000), the United States Court of Appeals for the Fourth Circuit made clear that

> while the Supreme Court has never set forth a less rigorous standard for partial closures, some circuits have relaxed the first Waller requirement where a temporary or partial closure of a proceeding is at issue. Specifically, these circuits have required only that the state advance a "substantial reason" for closing the proceeding because, unlike those situations involving a complete closure, a partial closure does not threaten as acutely the historical concerns sought to be addressed by the Sixth Amendment.

2

Id. at 168 n.11; see also United States v. Osborne, 68 F.3d 94, 98-99 (5th Cir. 1995); United States v. Farmer, 32 F.3d 369, 371 (8th Cir. 1994); United States v. Sherlock, 962 F.2d 1349, 1356-57 (9th Cir. 1992); Nieto v. Sullivan, 879 F.2d 743, 753 (10th Cir. 1989); Douglas v. Wainwright, 739 F.2d 531, 532-33 (11th Cir. 1984) (per curiam).

The rationale for maintaining a heightened burden on the government with regard to the first prong is, thus, that complete closures implicate Sixth Amendment concerns more seriously than partial closures. It makes intuitive sense, then, to raise the hurdle the government must jump over to show a need to bar, say, the press, the public, and the defendant's family, rather then just the press. However, it is neither equally as intuitive nor required by the test's plain language to heighten the requirements of the fourth prong for the same reason. After all, the first prong of the Press-Enterprise I test is qualitatively different from the final three. The former places a burden on the party seeking closure; the latter three assign responsibilities to the court.

Alternatively, the Supreme Court constructed the first three prongs out of respect for the right of access to criminal trials. Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 606 (1982) (referring to the "particularly significant role"

3

public access plays in the proper functioning of the judiciary because "[p]ublic scrutiny of a criminal trial enhances the quality and safeguards the integrity of the factfinding process, with benefits to both the defendant and to society as a whole . . . [and] fosters an appearance of fairness, thereby heightening public respect for the judicial process. . . . [I]n the broadest terms, public access to criminal trials permits the public to participate in and serve as a check upon the judicial process -- an essential component in our structure of self-government"). The intention behind the fourth prong, however, was to ensure that "a reviewing court can determine whether the closure order was properly entered." Press-Enterprise I, 464 U.S. at 510.

Through either lens, the first and fourth prongs of the Press-Enterprise I test are analytically distinct. An admittedly logical rationale for heightening a party's burden under the former cannot automatically translate into an appropriate reason to heighten a different party's responsibility under the latter. This is likely the reason why courts, when presented with less than complete findings on the record in partial closure cases, do not base their acceptance of such findings vis-à-vis the fourth prong on the grounds that partial closures do less harm to the right of access at the core of the Sixth Amendment. See, e.g., Bell, 236 F.3d at 170-71

4

(upholding a partial closure even without explicit findings because the record revealed the judge knew the witness's particular characteristics, the facts of the case, and the nature of the testimony); United States v. Bow, 1997 U.S. App. LEXIS 5326, at *8, 1997 WL 124345, at *3 (9th Cir. 1997) (same). In Bell and Bow, then, what merited acceptance of nonexplicit findings was not that partial closures caused less harm to Sixth Amendment rights, but because the records of trial, upon the appellate courts' own review, described facts necessary to meet each prong and adequately evidenced the judge's rationale in deciding to close the courtroom.

The record in Appellant's case is equally sufficient. First, it is replete with evidence of the need to close the courtroom.  Trial counsel moved for courtroom closure after a lengthy attempt to extract audible testimony from BP and after her body language and rude behavior suggested her level of discomfort.  BP had "difficulty testifying. . . . resulting from some embarrassment," according to trial counsel, and clearing the gallery of spectators would alleviate that embarrassment. Given that the Discussion to Rule for Courts-Martial (R.C.M.) 806(b) requires an overriding interest and lists avoiding embarrassment as one such interest, the record reasonably describes the military judge's understanding that trial counsel

5

advanced a recognized overriding interest to close the courtroom, thus satisfying the test's first prong.

The record also makes clear that the military judge narrowly tailored the closure to suit the needs of the witness and the overriding interest offered by the Government. Before granting the motion, the military judge questioned the witness extensively. BP admitted that she was speaking in a low, mumbled tone because she was nervous. After some additional questioning, the witness also admitted that her nerves made it difficult to testify and that she was nervous because there were so many people in the gallery. The military judge asked if the witness would be more at ease if she faced away from the spectators and spoke directly to the military judge. The witness still maintained that she was nervous. Given BP's age, Post-Traumatic Stress Disorder diagnosis, and the private nature of the allegations against Appellant, her nervousness is understandable. Moreover, upon deciding to close the courtroom, the military judge advised counsel that she wanted to "minimize the time that the courtroom is going to be closed," even stating that as soon as the witness appeared more comfortable testifying, the courtroom would be reopened. In addition, BP actually testified in public for nearly one-third of her testimony. She started her testimony shortly after 9:30 a.m. and continued to shortly after 10:54 a.m., representing fifty-

6

three pages in the record.  She testified in closed court until page 210 of the record and was later recalled for another ten pages.

Finally, the record indicates that the military judge considered a number of alternatives before closing the courtroom.  She used a comfort break, admonished the witness to behave in a courteous manner, asked if turning away from the spectators would relieve the witness's nervousness, and directed trial counsel to move to another area of the courtroom to facilitate the witness in projecting her voice.  All these failed.  The witness continued to slouch, mumble under her breath, make rude comments, and manifest her discomfort as a witness in open court.  The military judge's only remaining recourse was to close the courtroom.

Since the record in this case is adequate to support this Court's review and because the record evidences a narrowly tailored closure used as a last resort and based on a recognized overriding interest, I would uphold the military judge's decision to close the courtroom during part of BP's testimony. I therefore dissent.